# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| **MILLENNIUM INORGANIC** <br> **CHEMICALS LTD.** <br> c/o Millennium Inorganic Chemicals Inc. <br>    20 Wight Avenue <br>    Hunt Valley, Maryland 21030; and | * <br> * <br> * | Case No. _____ |
| | * | **JURY TRIAL DEMANDED** |
| **CRISTAL INORGANIC** <br> **CHEMICALS LIMITED** <br> c/o Millennium Inorganic Chemicals Inc. <br>    20 Wight Avenue <br>    Hunt Valley, Maryland 21030 | * <br> * <br> * <br> * | |
| v. | * | |
| **NATIONAL UNION FIRE INSURANCE** <br> **COMPANY OF PITTSBURGH, PA** | * <br> * | |
|    <u>Serve</u>: MD Insurance Commissioner <br>       525 St. Paul Place <br>       Baltimore, MD 21202 | * <br> * | |
| **and** | * | |
| **ACE AMERICAN INSURANCE** <br> **COMPANY** | * <br> * | |
|    <u>Serve</u>: MD Insurance Commissioner <br>       525 St. Paul Place <br>       Baltimore, MD 21202 | * <br> * <br> * | |
| **and** | * | |
| **MARSH USA INC.** | * | |
|    <u>Serve</u>: The Corporation Trust Inc. <br>       300 E. Lombard Street <br>       Baltimore, MD 21202 | * <br> * | |

## <u>COMPLAINT</u>

Plaintiffs, Millennium Inorganic Chemicals Ltd. and Cristal Inorganic Chemicals Limited (collectively "Millennium"), by undersigned counsel, hereby sue Defendants, National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), Ace American Insurance Company ("Ace"), and Marsh USA Inc. ("Marsh"), and state:

## NATURE OF ACTION

1.   This Complaint is for declaratory relief, breach of contract, and bad faith arising out of, and in connection with, certain insurance policies purchased by Millennium from National Union and Ace.

2.   In the alternative, this Complaint is for breach of contract, negligence, and negligent misrepresentation arising out of and in connection with Marsh's ("Marsh") brokering, negotiation, and sale of the National Union and Ace insurance policies referenced in ¶ 1 above.

## THE PARTIES

3.   Plaintiff Millennium Inorganic Chemicals Ltd. is a corporation organized under the laws of Australia with offices located at Lot 4 Old Coast Road, Australind 6233, Western Australia.

4.   Plaintiff Cristal Inorganic Chemicals Limited is a corporation organized under the laws of the Cayman Islands with offices c/o Appleby Trust (Cayman) Ltd., Clifton House, 75 Fort Street, P.O. Box 1350, Grand Cayman KY1-1108, Grand Cayman.

5.   Upon information and belief, Defendant National Union is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 175 Water Street, 18th Floor, New York, NY 10038.  National Union is engaged in the property and casualty insurance business and regularly transacts business in the State of Maryland.

6.   Upon information and belief, Defendant Ace is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at P.O. Box 41484, TL14F, Philadelphia, PA, 19101.  Ace is engaged in the property and casualty insurance business and regularly transacts business in the State of Maryland.

7.   Upon information and belief, Defendant Marsh is a corporation organized under the laws of the State of Delaware with its principal place of business at 1221 Avenue of the Americas, New York, NY 10020.  Marsh is engaged in the insurance brokerage business and regularly transacts business in the State of Maryland.

## JURISDICTION AND VENUE

8.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, because the matter in controversy involves a dispute between citizens of a State and citizens or subjects of a foreign state, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

9.   Venue is proper in this Court pursuant to 28 U.S.C. §1391, because all of the Defendants reside in this state and this judicial district; and a substantial part of the events giving rise to this Complaint occurred in this district.

## FACTUAL BACKGROUND

### A.      Millennium's Business Operations

10.  Millennium, in conjunction with various affiliates, is the second largest global producer of titanium dioxide, which is a white pigment used in the manufacturing of a range of products such as coatings (*e.g.* paint), plastics, and paper.

11.  Among its global manufacturing facilities, Millennium operates two inter-dependent plants for the production and finishing of titanium dioxide near Bunbury, Western Australia (the

"Bunbury Operations").  These plants are Millennium's only manufacturing facilities in the Asia Pacific region.

12.  Natural gas is the main source of energy for the Bunbury Operations and is also used as a material for, among other things, process heating, steam generation, and drying in the manufacturing process.

13.  There are various "producers" of natural gas in Western Australia, such as Apache Corporation (through a joint-venture with Santos (bol) Pty. Ltd.) (collectively referred to hereinafter as "Apache"), Arc Energy and Origin Energy (collectively, the "Producers").

14.  Producers provide natural gas to an inlet flange of the Dampier to Bunbury Natural Gas Pipeline (the "DBNGP"), which is Western Australia's principal gas transmission pipeline, and runs approximately 1,000 miles from the Burrup Peninsula near Dampier to Bunbury.

15.  Natural gas delivered by Producers to the inlet flange of the DBNGP is delivered to retail and commercial customers by DBP Transmission, the pipeline owner/operator, under the direction of "Shippers" who have contracted capacity in the DBNGP.

16.  Specifically with respect to Millennium, the natural gas used at the Bunbury Operations is transported from the gas fields off the Australian coast through a transfer facility owned and operated by Apache on Varanus Island (approximately 70 miles off the Northwest coast of Australia), into and through the DBNGP and then directly to Millennium's Bunbury Operations.

17.  Apache is the only Producer of natural gas from Varanus Island and is an indispensable party with respect to the supply of natural gas for Millennium's Bunbury Operations.

18.  Millennium is unable to purchase gas from Apache, since capacity on the DBNGP is full.  Instead, Millennium must rely on a Shipper to facilitate the shipment of gas from Apache to its Bunbury Operations.   Since there is no additional capacity on the DBNGP, Millennium cannot become a Shipper and therefore is wholly reliant upon other parties to provide gas "shipping" services.

19.  Alinta Sales Limited ("Alinta"), one of the several Shippers operating in Western Australia, facilitates the shipment and transfer of natural gas from Apache to Millennium's Bunbury Operations.

20.  Acting solely in its role as a Shipper of natural gas, Alinta does not own any gas production facilities, but merely facilitates the transfer of natural gas from Apache to Millennium.

21.  Pursuant to a long-term "take-or-pay" contract originally executed in December 1997 with Millennium, Alinta facilitates the transfer to Millennium's Bunbury Operations of a specified amount of natural gas delivered by Apache to the inlet flange of the DBNGP.

22.  Apache's continuous, uninterrupted supply of natural gas to Millennium is essential to the Bunbury Operations.

**B.      Marsh's Role in Insuring the Bunbury Operations**

23.  Marsh had served as Millennium's broker with respect to evaluating Millennium's insurance requirements and obtaining policies of insurance for Millennium (including for Millennium's Bunbury Operations) for some time.  As part of its involvement with Millennium, for example, Marsh coordinated detailed risk assessments for the Bunbury Operations that were conducted by AIG Technical Services (an affiliate of National Union) in November of 2007.

24. In early 2008, Millennium decided to conduct a Request for Proposal ("RFP"), seeking insurance brokerage for all of Millennium's insurance requirements, including those of the Bunbury Operations.  In a letter dated February 1, 2008, Millennium advised Marsh of its RFP.

25. In this February 1, 2008 letter, Millennium advised Marsh that it was soliciting a proposal from Marsh for its insurance and risk management services, provided background information regarding Millennium, and specified that Millennium required a broker that, among other things, had a process for identifying and managing current and emerging risk exposures.

26. On February 19, 2008, Marsh submitted a 72-page Response to Millennium's RFP, in which Marsh held itself out as an expert in a multitude of areas including the identification of, and acquisition of insurance coverage for, business interruptions risks.

27. In its Response to Millennium's RFP, Marsh represented that:

- through its diligence, Marsh had "recognized that there are time element exposures in [Millennium's] manufacturing operations, including interdependencies and contingent time element exposures."

- "Marsh's Business Interruption and Interdependency Analysis platform is a systematic approach to identifying, mapping and quantifying the time element exposures, so that the most effective mitigation strategies can be applied."

- Marsh's "property risk consultants' experience with operational risk issues affords [Marsh] a unique insight into business interruption, interdependency and contingent business interruption exposures."

- Marsh's "deep technical experience, coupled with specific knowledge of the chemical industry gives [Millennium] access to resources to help define and mitigate specific sources of operational risk."

- Marsh's approach was "scalable and flexible; beginning with a process that systematically maps your operations, key suppliers and vendors and quantifies your business interruption risk."

28. Based on Marsh's Response to RFP and other communications with Marsh, Millennium selected and hired Marsh to place certain insurance coverage for Millennium for the policy year beginning May 16, 2008, including coverage relating to the Bunbury Operations.

29. Once selected by Millennium, Marsh began the process of brokering a renewal of Millennium's "All-Risk" Property Insurance Policy, including coverage for business interruption losses, and which was set to expire on May 16, 2008.

30. Between February and May of 2008, Marsh marketed the renewal of Millennium's "All-Risk" Property Insurance Policy to various insurers and, as requested by Millennium, sought to increase the total limit of liability from an existing $200 million to $450 million.

31. Marsh eventually secured, on behalf of Millennium, $450 million of "All Risk" Property Insurance through policies to be issued by National Union (a/k/a AIG) and Ace (a/k/a Starr Tech), each of which would be responsible for 50% of the $450 million total limit of liability (collectively the "Policies").

32. By letter dated May 15, 2008, delivered to Millennium's office at 20 Wight Avenue, Suite 100, Hunt Valley, Maryland 21030, Marsh represented that coverage was bound and provided Millennium with binders of insurance for the National Union and Ace coverage.

33. The National Union binder stated that National Union was providing coverage under 'All Risk' Property and Machinery Breakdown Policy no.: 263 27 29, with a coverage period of 5/16/2008 to 5/16/2009 (the "National Union Policy").

34. The Ace binder stated that Ace was providing coverage under 'All Risk' Property and Machinery Breakdown Policy no.: PGL N05058077, with a coverage period of 5/16/2008 to 5/16/2009 (the "Ace Policy").

35. Among other representations regarding coverage made in its May 15, 2008 letter enclosing the binders of insurance, Marsh represented that it had secured the following sub-limits for contingent business interruption losses:

- $25,000,000   Contingent Business Interruption – Direct Contributing or Recipient Property(ies); and

- $10,000,000   Unnamed Contingent Business Interruption.

36. Upon receiving Marsh's May 15, 2008 letter enclosing the binders of insurance, Millennium understood and believed that Marsh had secured $450 million of "All Risk" Property Insurance for Millennium, with the aforementioned sub-limits for contingent business interruption losses, and that Marsh would promptly deliver the actual National Union Policy and the Ace Policy.

37. Millennium was charged a substantial premium for the coverage provided by the National Union Policy and the Ace Policy, and paid Marsh substantial fees for the services described in Marsh's Response to Millennium's RFP.

**C.    The Varanus Island Explosion and Millennium's Loss**

38. On June 3, 2008, a massive explosion at the Apache facility on Varanus Island resulted in interruption of approximately 30% of the total gas supply to Western Australia (the "Explosion"). As a result, remaining natural gas supplies were prioritized for domestic use and to essential industry and services.

39.  Immediately after the Explosion, Apache issued a Notice of *Force Majeure* Event dated June 3, 2008 stating that Apache was unable to supply gas for Alinta to ship to Millennium's Bunbury Operations.

40.  Alinta subsequently issued a *Force Majeure* notice advising that its facilitation of gas shipments to the Bunbury Operations would be terminated due to shortages.

41.  As a result, production of titanium dioxide at Millennium's Bunbury Operations was immediately ceased.

42.  Although operations were gradually resumed, the interruption of deliveries of gas to the Bunbury Operations caused Millennium to incur total losses in excess of $10 million (the "Bunbury Loss").

43.  Millennium, through Marsh and with Marsh's assistance and counsel, promptly notified National Union and Ace of the Bunbury Loss in compliance with any and all relevant provisions in the National Union Policy and the Ace Policy.

**D.      The National Union Policy and the Ace Policy**

**(i)      Millennium's Receipt of the Policies**

44.  Millennium did not receive copies of either the National Union Policy or the Ace Policy until after National Union and Ace were put on notice, through Marsh, of the Bunbury Loss.

45.  By letter dated June 30, 2008 (the "National Union Policy Transmittal Letter"), Marsh delivered a copy of the National Union Policy to Millennium's Treasurer, Rob Williams, at Millennium's office in Hunt Valley.

46.  In the National Union Policy Transmittal Letter, Marsh once again represented that it had secured the following sub-limits for contingent business interruption losses:

- $25,000,000   Contingent Business Interruption – Direct Contributing or Recipient Property(ies); and

- $10,000,000   Unnamed Contingent Business Interruption.

47. By letter dated August 7, 2008 (the "Ace Policy Transmittal Letter"), Marsh delivered a copy of the Ace Policy to Millennium's Treasurer, Rob Williams, at his Hunt Valley office.

48. In the Ace Policy Transmittal Letter, Marsh once again represented that it had secured the following sub-limits for contingent business interruption losses:

- $25,000,000   Contingent Business Interruption – Direct Contributing or Recipient Property(ies); and

- $10,000,000   Unnamed Contingent Business Interruption.

49. The Ace policy is written on the same form as the National Union Policy and is, except as described below, identical to the National Union Policy.

50. There is, however, one glaring difference between the policies. Specifically, Endorsement No. 8, which, among other policy provisions, confers coverage for the Bunbury Loss, in the Ace Policy (delivered to Millennium by letter dated August 7, 2008, over two months after the loss) inexplicably includes the phrase "**DIRECT ONLY**" in the Schedule of Location(s) section of the Endorsement, whereas the earlier delivered National Union Policy contains no such additional language. Marsh did not, in the Ace Policy Transmittal Letter, alert Millennium to the fact that Ace had added the "**DIRECT ONLY**" language to Endorsement No. 8, even though, as described below, Marsh was actively assisting Millennium with the Bunbury Loss claim.

**(ii)      The Coverage Afforded by the Policies**

51.   The National Union Policy and the Ace Policy provide to Millennium $450 million of "All Risk" coverage for which Millennium was charged a substantial premium.

52.   Millennium purchased these Policies through its broker Marsh to insure Millennium's worldwide operations for all risks, including the risks associated with the supply of natural gas on which it relied for its Bunbury Operations, and without which, the Bunbury Operations could not operate, and which risk was known to Millennium's insurers and its broker.

53.   Specifically, amongst the broad areas of coverage provided for by the Policies, the National Union Policy and the Ace Policy both provide, among other coverages, contingent business interruption coverage for a loss of the type at issue here.

54.   Contingent business interruption insurance can commonly be defined as indemnity cover bought to compensate for the losses incurred due to interruption or stoppage of a key suppliers' business.

55.   Both of the Policies sold to Millennium provide contingent business interruption coverage in the amount of $25,000,000 per occurrence relating to named properties and $10,000,000 per occurrence for unnamed properties.

56.   Specifically, the Declarations in both Policies provide for coverage as follows:

| | | |
|---|---|---|
| Contingent Time Element - | $25,000,000 | Named Per Occurrence |
| Direct Contributing | $10,000,000 | Unnamed Per Occurrence |
| Or Recipient Property(ies) | | |

57.   Nowhere in the policies, however, is the term "Direct Contributing Property(ies)" defined.

58.   Nowhere in the relevant sections of the Policies regarding contingent business interruption coverage, moreover, is the term "Unnamed" even used.

**E.   National Union and ACE's Inconsistent Coverage Positions and Wrongful Denial of Coverage**

59. National Union, on behalf of itself and Ace, has explicitly denied coverage to Millennium for the Bunbury loss.

60. By letter dated July 31, 2008, approximately 1 month after Millennium received the National Union Policy and approximately 1 week *before* Millennium received the Ace Policy, National Union's representative denied coverage to Millennium for the Bunbury loss.   This decision to deny coverage came before Millennium had even submitted its formal Proof of Loss/Claim Submission to National Union/Ace.

61. In December 2008, Millennium timely submitted a detailed Proof of Loss/Claim Submission to National Union/Ace in which Millennium explained the various grounds upon which National Union/Ace were required to cover the Bunbury Loss.

62. By letter dated February 3, 2009, a National Union representative once again denied coverage to Millennium for the Bunbury loss.

63. National Union's and Ace's coverage positions are based, in part, on meritless assertions that the National Union Policy and the Ace Policy do not provide coverage for the Bunbury loss in the first instance.

64. National Union's and Ace's coverage positions are further based, in part, on meritless assertions that various provisions of the National Union Policy and the Ace Policy specifically exclude coverage for the Bunbury loss.

65. If National Union and Ace's coverage positions had merit, many provisions of the National Union Policy and the Ace Policy would be rendered meaningless and insurance coverage for which Millennium paid a premium would be illusory.

66. Coverage exists for the Bunbury loss under the Policies, and National Union and Ace's coverage positions are a direct result of their respective failure to handle the Bunbury Loss claim in a diligent and good faith manner.

**Count I**
**DECLARATORY JUDGMENT**
**(National Union and Ace)**

67. Millennium reasserts and realleges the allegations contained in paragraphs 1 through 66 above and incorporates those allegations by reference as if set forth fully herein.

68. Millennium has given proper notice to National Union and Ace regarding the Bunbury Loss and maintains that coverage exists under the National Union Policy and the Ace Policy for the full amount of the Bunbury Loss.

69. National Union and Ace have denied coverage under their respective policies, on various, inconsistent grounds, and have failed and refused to reimburse Millennium for Millennium's incurred losses in connection with the Bunbury Loss.

70. National Union's and Ace's denial of coverage has no basis in law or fact.

71. There exists an actual controversy of a practicable issue between Millennium, on the one hand, and National Union and Ace, on the other hand, within the jurisdiction of this Court involving the rights and liabilities of the parties under contracts of insurance, which controversy may be determined by a judgment of this Court.

WHEREFORE, Plaintiff Millennium demands:

A. That this Court determine and adjudicate the rights and liabilities of the parties with respect to the National Union Policy and the Ace Policy.

B.      That this Court find and declare that Defendant National Union and Defendant Ace are liable, jointly and severally, to Plaintiff for the full amount of the Bunbury Loss, and enter judgment in favor of Millennium for the same, plus pre- and post-judgment interest.

C.      That this Court award to Millennium its attorneys' fees and costs with respect to these proceedings.

## Count II
## BREACH OF CONTRACT
### (National Union and Ace)

72.   Millennium reasserts and realleges the allegations contained in paragraphs 1 through 71 above and incorporates those allegations by reference as if set forth fully herein.

73.   National Union breached the National Union Policy and Ace breached the Ace Policy by refusing to pay amounts due to Millennium under the policy and arising from the Bunbury Loss.

74.   As a result of National Union's and Ace's breach of their respective insurance policies, Millennium has suffered direct and consequential damages.

WHEREFORE, Plaintiff Millennium requests that this Court enter a money judgment in favor of it for actual damages in the amount of $11,503,848 plus pre-judgment and post-judgment interest, and any and all other costs and fees, and any and all other and further relief as justice and its cause require.

## Count III
## BAD FAITH
### (National Union and Ace)

75.  Millennium reasserts and realleges the allegations contained in paragraphs 1 through 74 above and incorporates those allegations by reference as if set forth fully herein.

76.  The National Union Policy and the Ace Policy are commercial insurance policies, as defined in § 1-101 of the Insurance Article of the Maryland Code.

77.  The applicable limit of liability in the National Union Policy and the Ace Policy, with respect to the Bunbury Loss claim, exceeds $10,000,000.

78.  National Union and Ace breached the duty owed to their insured, Millennium, in failing to fulfill their obligations as set out in the National Union Policy and the Ace Policy.

79.  National Union and Ace were negligent in evaluating the Bunbury Loss claim and failed to exercise good faith and due care in protecting the interests of their insured, Millennium.

80.  National Union and Ace acted in bad faith in evaluating and denying the Bunbury loss claim by failing to make an informed judgment based on honesty and diligence.

WHEREFORE, Plaintiff Millennium requests that this Court enter money judgment in favor of it for actual damages up to the applicable limits of the National Union Policy and the Ace Policy; for expenses and litigation costs incurred by Millennium in connection with the Bunbury Loss claim and this action, including reasonable attorneys' fees; interest on all damages incurred by Millennium; any and all other costs and fees, and any and all other and further relief as justice and its cause require.

**Count IV**
**BREACH OF CONTRACT**
**(Marsh)**

81.  Millennium reasserts and realleges the allegations contained in paragraphs 1 through 80 above and incorporates those allegations by reference as if set forth fully herein.

82.  At all time material hereto, Marsh was party to an agreement with Millennium to act as Millennium's broker to procure insurance coverage to cover its worldwide risks, specifically including, but not limited to, contingent business interruption coverage with respect to Millennium's Bunbury Operations.

83.  Pursuant to this agreement, Marsh had a duty to act in good faith and to exercise reasonable skill, care, and diligence to procure said coverage.

84.  Marsh acted as Millennium's agent in this regard.

85.  Marsh represented to Millennium that it had obtained coverage for "Contingent Business Interruption – Direct Contributing or Recipient Property(ies)" ($25 million limit), as well as coverage for "Unnamed Contingent Business Interruption" ($10 million limit).

86.  Following the June 3, 2008 explosion at the gas production facility on Varanus Island, off of the coast of Western Australia, Millennium suffered losses stemming from the ensuing interruption to the supply of natural gas, electricity, and materials.   Millennium subsequently made a claim to its insurers for insurance coverage for its losses.

87.  National Union and Ace have denied coverage under their respective policies.

88.  Marsh failed to act in good faith and/or exercise reasonable skill, care, and diligence to procure coverage as required by the agreement.

89.  Marsh failed to notify Millennium of its failure to procure coverage as requested.

90.  Marsh breached its agreements to act in good faith and to exercise reasonable skill, care, and diligence to procure the requested coverage.

91.  Marsh's failure to properly procure insurance coverage was the cause of Millennium's failure to receive insurance benefits which it would have received if coverage had been properly procured.

WHEREFORE, Plaintiff Millennium requests that this Court enter a money judgment in favor of it for actual damages in the amount of $11,503,848, plus pre-judgment and post-judgment interest, and any and all other costs and fees, and any and all other and further relief as justice and its cause require.

**Count V**
**NEGLIGENCE**
**(Marsh)**

92.  Millennium reasserts and realleges the allegations contained in paragraphs 1 through 91 above and incorporates those allegations by reference as if set forth fully herein.

93.  At all time material hereto, Marsh was party to an agreement with Millennium to act as Millennium's broker to procure insurance coverage to cover its worldwide risks, specifically including, but not limited to, contingent business interruption coverage with respect to Millennium's Bunbury Operations.

94.  Pursuant to this agreement, Marsh had a duty to act in good faith and to exercise reasonable skill, care, and diligence to procure said coverage.

95.  Marsh acted as Millennium's agent in this regard.

96.  Marsh represented to Millennium that it had obtained coverage for "Contingent Business Interruption – Direct Contributing or Recipient Property(ies)" ($25 million limit), as well as coverage for "Unnamed Contingent Business Interruption" ($10 million limit).

97. Following the June 3, 2008 explosion at the gas production facility on Varanus Island, off of the coast of Western Australia, Millennium suffered losses stemming from the ensuing interruption to the supply of natural gas, electricity, and materials.  Millennium subsequently made a claim to its insurers for insurance coverage for its losses.

98.  National Union and Ace have denied coverage under their respective policies.

99.  Marsh failed to act in good faith and/or exercise reasonable skill, care, and diligence to procure coverage as required by the agreement.

100.  Marsh failed to notify Millennium of its failure to procure coverage as requested.

101.  Marsh breached its duty to act in good faith and to exercise reasonable skill, care, and diligence to procure the requested coverage.

102.  Marsh's failure to properly procure insurance coverage was the cause of Millennium's failure to receive insurance benefits which it would have received if coverage had been properly procured.

WHEREFORE, Plaintiff Millennium requests that this Court enter a money judgment in its favor in the amount of $11,503,848 plus pre-judgment and post-judgment interest, and any and all other costs and fees, and any and all other and further relief as justice and its cause require.

## Count VI
## NEGLIGENT MISREPRESENTATION
### (Marsh)

103.  Millennium reasserts and realleges the allegations contained in paragraphs 1 through 102 above and incorporates those allegations by reference as if set forth fully herein.

104.  At all time material hereto, Marsh was party to an agreement with Millennium to act as Millennium's broker to procure insurance coverage to cover its worldwide risks, specifically including, but not limited to, contingent business interruption coverage with respect to Millennium's Bunbury Operations.

105.  Pursuant to this agreement, Marsh had a duty to act in good faith and to exercise reasonable skill, care, and diligence to procure said coverage.

106.  Marsh acted as Millennium's agent in this regard.

107.  Marsh represented to Millennium that it had obtained coverage for "Contingent Business Interruption – Direct Contributing or Recipient Property(ies)" ($25 million limit), as well as coverage for "Unnamed Contingent Business Interruption" ($10 million limit).

108.   Following the June 3, 2008 explosion at the gas production facility on Varanus Island, off of the coast of Western Australia, Millennium suffered losses stemming from the ensuing interruption to the supply of natural gas, electricity, and materials.   Millennium subsequently made a claim to its insurers for insurance coverage for its losses.

109.  National Union and Ace have denied coverage under their respective policies.

110.  Marsh negligently represented to Millennium that it had obtained insurance coverage for Millennium's Australian operations, specifically including, but not limited to, contingent business interruption losses in connection with the Bunbury Operations.

111.  Marsh intended that Millennium would rely and act upon its statements.

112.  Marsh knew that Millennium would rely on its statements, which, if erroneous, would cause loss or injury.

113.  Millennium reasonably relied and acted on the representations and acts of Marsh with respect to said services as to coverage in connection with its Bunbury Operations when it purchased the insurance, paid the premium, and carried on activity in connection with its Bunbury Operations.

114.  As a result of the misrepresentations made by Marsh, Millennium suffered injury and damages.

WHEREFORE, Plaintiff Millennium requests that this Court enter a money judgment in its favor in the amount of $11,503,848, plus pre-judgment and post-judgment interest, and any

and all other costs and fees, and any and all other and further relief as justice and its cause require.

## Count VII
## BREACH OF FIDUCIARY DUTY
## (Marsh)

115.   Millennium reasserts and realleges the allegations contained in paragraphs 1 through 114 above and incorporates those allegations by reference as if set forth fully herein.

116.   At all time material hereto, Marsh was party to an agreement with Millennium to act as Millennium's broker to procure insurance coverage to cover its worldwide risks, specifically including, but not limited to, contingent business interruption coverage with respect to Millennium's Bunbury Operations.

117.   Pursuant to this agreement, Marsh had a duty to act in good faith and to exercise reasonable skill, care, and diligence to procure said coverage.

118.   This agreement established a fiduciary relationship between Marsh and Millennium.

119.   Marsh was Millennium's agent in this regard.

120.   Marsh represented to Millennium that it had obtained coverage for "Contingent Business Interruption – Direct Contributing or Recipient Property(ies)" ($25 million limit), as well as coverage for "Unnamed Contingent Business Interruption" ($10 million limit).

121.   Following the June 3, 2008 explosion at the gas production facility on Varanus Island, off of the coast of Western Australia, Millennium suffered losses stemming from the ensuing interruption to the supply of natural gas, electricity, and materials.   Millennium subsequently made a claim to its insurers for insurance coverage for its losses.

122.   National Union and Ace have denied coverage under their respective policies.

123.   Marsh failed to act in good faith and/or exercise reasonable skill, care, and diligence to procure coverage as required by the agreement.

124.   Marsh failed to notify Millennium of its failure to procure coverage as requested.

125.   Marsh breached the fiduciary duty that it owed to Millennium.

126.   Marsh's breach of the fiduciary duty that it owed to Millennium was the cause of Millennium's failure to receive insurance benefits which it would have received if coverage had been properly procured.

WHEREFORE, Plaintiff Millennium requests that this Court enter a money judgment in its favor in the amount of $11,503,848 plus pre-judgment and post-judgment interest, and any and all other costs and fees, and any and all other and further relief as justice and its cause require.

## **JURY DEMAND**

Millennium requests a trial by jury on all issues so triable.

Dated:  July 17, 2009                                    Respectfully submitted,


                                                         _____/s/_____
                                                         Gary C. Duvall (Bar No.: 1144)
                                                         Jeffrey P. Reilly (Bar No.: 5837)
                                                         MILES & STOCKBRIDGE P.C.
                                                         One West Pennsylvania Avenue, Suite 900
                                                         Towson, Maryland 21204
                                                         410.821-6565
                                                         410.385.3700 (f)
                                                         gduvall@milesstockbridge.com
                                                         jreilly@milesstockbridge.com


                                                         _____/s/_____
                                                         John C. Celeste (Bar No.: 26810)
                                                         Joseph L. Beavers (Bar No.: 27586)
                                                         MILES & STOCKBRIDGE P.C.

10 Light Street
Baltimore, Maryland 21202
410.727.6464
410.385.3700 (f)
jceleste@milesstockbridge.com
jbeavers@milesstockbridge.com

*Attorneys for Plaintiffs*