**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

Chambers of
**Ellen Lipton Hollander**
District Court Judge

101 West Lombard Street
Baltimore, Maryland 21201
410-962-0742

April 15, 2011

MEMORANDUM TO COUNSEL

    Re:    *Millennium Inorganic Chemicals Ltd., et al. v. Nat'l Union Fire Ins. Co., et al.*
           Civil Action No. ELH-09-1893

Dear Counsel:

This memorandum addresses the discovery dispute that was brought to the Court's attention by a letter from Mr. Voigt, counsel for defendants National Union Fire Insurance Company of Pittsburgh, PA and Ace American Insurance Company (collectively, "Insurers"), dated March 7, 2011 (ECF 69). The dispute concerns an exchange of emails (the "NMB Communications"), and focuses on whether they are protected from discovery by the work product doctrine.

The Court has carefully reviewed all of the parties' submissions in connection with the dispute, including the parties' letter briefs of March 15, 2011 ("Insurers Brief," ECF 72, and "Millennium Brief," ECF 73); the supplemental letter briefs filed by Millennium on March 25, 2011 ("Millennium Supp.," ECF 80) and by the Insurers on April 8, 2011 ("Insurers Supp.," ECF 91); and two affidavits and various other exhibits, including documents submitted for *in camera* review (among them, the NMB Communications themselves (ECF 83)). The Court has also considered the arguments advanced by counsel in the telephonic conference held on March 17, 2011. As I shall explain, I conclude that the NMB Communications are protected work product.

## Factual Background

The underlying action is rooted in the events of June 3, 2008, when an explosion and fire occurred at the Varanus Island Gas and Oil Facility operated by Apache Energy Limited in Western Australia. The explosion and fire interrupted the natural gas supply to Western Australia, which in turn interrupted the operation of titanium dioxide manufacturing facilities near Bunbury, Western Australia, operated by the plaintiffs, Millennium Inorganic Chemicals Ltd. and Cristal Inorganic Chemicals Limited (collectively, "Millennium"). Thereafter, Millennium submitted a business interruption insurance claim to the Insurers for the losses sustained as a result of the occurrence. Millennium sought to recover under property insurance coverage issued by the Insurers for the period from May 16, 2008 to May 16, 2009.[1] By letter

---

[1] Marsh USA Inc. ("Marsh"), a co-defendant, was the insurance broker that allegedly assisted Millennium in procuring the insurance coverage in effect at the time of the explosion.

dated July 31, 2008, signed by Paul Lafferty, Senior Claims Adjuster at AIG Global Energy Claims,[2] and sent to Robert Williams of Cristal Global, the Insurers denied coverage. Ex.1A to Millennium Supp. (ECF 80-2).

The discovery dispute at issue arose during the deposition of James G. Koutras, Esq., Millennium's Senior Corporate Counsel and Secretary, on January 4, 2011. *See* Ex.E to Insurers Brief (ECF 72-6). In particular, pursuant to Federal Rule of Civil Procedure 26(b)(3) (hereafter, "Rule 26(b)(3)"), Millennium asserted work product protection with respect to the NMB Communications. The NMB Communications consist of an exchange of three emails that occurred between Mr. Koutras and John Lambert of Newman Martin and Buchan Limited ("NMB"), during the period of September 15, 2008 to September 17, 2008.[3] *See* Ex.1G to Millennium Supp. (ECF 83). NMB is an insurance broker on lines of coverage for plaintiffs that are not the subject of this action.

The email exchange, according to Millennium, was made in anticipation of litigation against the Insurers. The Insurers disagree that the email exchange constitutes work product made in anticipation of litigation.

Set forth below is a timeline of the events surrounding the NMB Communications.[4]

<u>June 3, 2008</u>: The gas explosion occurs on Varanus Island. In the next two days, Millennium receives "*force majeure*" notices from its supplier of natural gas and electricity. Sometime thereafter (the communication is not contained in the record), Millennium presents its business interruption insurance claim to the Insurers.

<u>June 30, 2008</u>: In email correspondence with Koutras, James Wylie, an employee of NMB, discusses the services NMB will provide regarding claims on other lines of insurance that are unrelated to the Varanus Island explosion or the business insurance policy at issue in this case. *See* Ex.O to Insurers Supp. (ECF

---

Marsh has informed the Court that it takes no position with regard to the discovery dispute at issue (ECF 71).

[2] National Union, one of the Insurers, is a "member company of American International Group ('AIG')." Insurers Brief at 1.

[3] The NMB Communications were inadvertently disclosed by plaintiffs during discovery, but the parties agree that plaintiffs have the right to "claw back" the NMB Communications if they are protected work product, in accordance with a "Stipulation and Order Governing the Production and Exchange of Confidential Material" (ECF 55-1), approved by Judge Blake on June 16, 2010 (ECF 56).

[4] These facts are drawn from the documents submitted by the parties. Although the parties dispute the import of various events memorialized in the documents, there is no dispute as to the authenticity of the documentary evidence.

|              | 91-4). Wylie confirms that NMB will "take on the handling" of the claims, which were previously handled by Marsh, and comments negatively on Marsh's previous work, remarking that "what Marsh are saying is total rot and yet another indicator of their appalling service attitude," opining that Marsh's "behaviour is a disgrace," and suggesting that Millennium deduct NMB's remuneration for handling the claims from Marsh's fees. *Id.* Wylie instructs Koutras to "have Marsh send" certain information regarding the claims to employees at NMB, including John Lambert. *Id.* |
|---|---|
| Late July 2008: | In the week before Lafferty's letter of July 31, 2008, denying coverage on plaintiffs' business interruption claim, Millennium and Marsh learn that a denial is in the offing. Koutras, Williams, and other personnel of Millennium and Marsh participate in a conference call to discuss the anticipated denial. Williams' handwritten notes from that conversation reflect that a "suit" is one of the "[r]esponses to claim" that the group considers. Ex.1C to Millennium Supp. (ECF 80-4). In the meantime, the Insurers' internal emails reflect their realization that the "CAT IS OUT OF THE BAG" regarding the forthcoming denial. Ex.1B to Millennium Supp. (ECF 80-3). |
| July 31, 2008: | On behalf of the Insurers, Lafferty issues his letter denying coverage. Ex.1A to Millennium Supp. (ECF 80-2). The letter explains in detail the reasons for the Insurers' conclusion that Millennium's loss is not covered by any of the terms of the insurance policy. Those reasons are not pertinent here. |
| August 5, 2008: | Koutras sends an email to Millennium's outside counsel, K&L Gates, outlining the facts relevant to the claim denial and discussing Millennium's legal strategy. Ex.1D to Millennium Supp. (ECF 80-4). This email has been submitted under seal and reviewed by the Court *in camera*. Without further disclosing its contents, it is appropriate to note that, as a component of Millennium's "planned path forward," Koutras's email indicates that Millennium should "be prepared to file a coverage action should AIG continue its denials." *Id.* Also in this time frame, as reflected in Millennium's "Legal Department Report" for the period of August 1-15, 2008, which was submitted under seal, Koutras directs K&L Gates to prepare a "budget" for providing a "coverage opinion" and for providing legal representation "in an insurance coverage action." Ex.1E to Millennium Supp. (ECF 82). |

| | |
|---|---|
| August 14, 2008: | Wylie, of NMB, again writes to Koutras to coordinate NMB's handling of the unrelated insurance claims previously handled by Marsh. As a postscript to his email, apparently in reference to Millennium's claim arising out of the Varanus Island explosion, Wylie states: "Regarding the Australian BI loss if you want to have an off the record chat with anyone regarding the Marsh/AIG lack of progress then let me know as we may have some thoughts for you." Ex.O to Insurers Supp. (ECF 91-4). |
| Late August 2008: | At Koutras's direction, Marsh obtains an extension until December 2008 of Millennium's deadline to file a "Sworn Proof of Loss" with the Insurers regarding the claim, for the purpose of contesting the Insurers' denial of coverage. *See* Ex.A to Insurers Brief (ECF 72-2). |
| September 11, 2008: | Koutras and other Millennium personnel meet with representatives of Marsh to discuss the claim and "what needed to be done to respond to the denial letter and file their proof of loss," as well as to plan for an "upcoming meeting with AIG" that is scheduled for late October. The meeting of September 11 is summarized in an internal Millennium memorandum authored by Koutras. *See* Ex.C to Insurers Brief (ECF 72-4). Koutras opines in the memorandum that "AIG denied coverage because there was no contract between Millennium and Apache, and AIG views Apache as an indirect supplier to Millennium." *Id.* at 4-5. According to Koutras, Marsh did not "expect AIG to change its position unless we are able to provide facts that establish a direct relationship between Apache and Millennium." *Id.* at 5. The memorandum concludes: "Additional actions [sic] items include obtaining additional counsel from our outside insurance coverage attorneys and responding to the AIG denial letter and preparing/filing our proof of loss with AIG . . . ." *Id.* at 6. |
| September 15-17, 2008: | The NMB Communications between Koutras and John Lambert of NMB take place.[5] *See* Ex.G to Millennium Supp. (ECF 83).[6] In the initial email on September 15, Lambert |

---

[5] Wylie of NMB and Williams of Millennium are both "courtesy copied" on the emails, but do not participate in the exchange.

[6] As noted, Millennium has filed the NMB Communications under seal for *in camera* review. However, the Insurers' attorneys are familiar with the contents because, as indicated, the NMB Communications were inadvertently disclosed by plaintiffs during discovery.

|  | informs Koutras that "James" (apparently James Wylie) has forwarded him some documents to review, and asks Koutras to provide him with additional documents as well as "a brief outline as to causation, loss, etc." Koutras responds later the same day with an email stating his views as to the relevant facts surrounding the Varanus Island explosion, the supply of natural gas to Western Australia, and Millennium's insurance claim. On September 17, Lambert replies with a frank assessment of the merits of Millennium's insurance claim and suggestions as to additional documentation that Koutras may want to review. |
|---|---|
| Late October 2008: | In the week before the scheduled meeting with representatives of the Insurers, Koutras sends an email to colleagues at Millennium, stating: "We have identified at least four separate arguments to present to AIG" at the meeting. Ex.D to Insurers Brief (ECF 72-5). However, in the same time frame, internal emails among personnel of the Insurers state that they "are hard pressed to understand what if anything the insured and[/]or Marsh can present that would change our opinion," and that they intend to meet with Koutras as "a courtesy." Ex.2 to Millennium Supp. (ECF 80-9). |
| October 30, 2008: | Koutras and other Millennium personnel, along with representatives from Marsh, meet with representatives of the Insurers at Marsh's offices in Philadelphia, to discuss the denial of Millennium's claim. The Insurers do not change their position as a result of this meeting, but, according to Koutras's deposition testimony, indicate that they will not "give [Millennium] a formal reply until [Millennium] file[s] [its] formal submission with them" in December. Ex.E to Insurers Brief at 341 (ECF 72-6). |
| November 2008: | Millennium continues to prepare its submission to the Insurers challenging the denial of the claim. |
| December 31, 2008: | Koutras submits to the Insurers a twelve-page letter presenting in detail Millennium's argument that Millennium's loss should be covered by the policy provided by the Insurers. |
| February 3, 2009: | The Insurers respond to Koutras's letter of December 31, 2008, reiterating their denial of Millennium's claim. *See* Insurers Supp. at 5. |
| July 17, 2009: | Millennium files suit in this Court. |

Additional facts are included in the discussion.

## Discussion

The work product doctrine is embodied in Rule 26(b)(3)(A) of the Federal Rules of Civil Procedure, which states:

> Ordinarily, a party may not discover documents and tangible things that are *prepared in anticipation of litigation* or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But . . . those materials may be discovered if:
>
> (i) they are otherwise discoverable . . . ; and
>
> (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means. (Emphasis added.)

The parties' dispute focuses on the element of "prepared in anticipation of litigation."[7] The federal rules do not define these terms; rather, their meaning has been developed in case law. *See* 2 EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK PRODUCT DOCTRINE 826 (5th ed. 2007) ("Epstein").

Millennium concedes that "it bears the burden of demonstrating that the NMB Communications were created in anticipation of litigation." *See, e.g.*, *Sandberg v. Va. Bankshares, Inc.*, 979 F.2d 332, 355 (4th Cir. 1992) ("The burden of proof rests with . . . the party asserting the work product doctrine, to demonstrate that the notes were prepared in anticipation of litigation."), *vac'd on other grounds*, 1993 WL 524680 (4th Cir. 1993). *See also In re Grand Jury Proceedings*, 616 F.3d 1172, 1185 (10th Cir. 2010); *In re Prof'ls Direct Ins. Co.*, 578 F.3d 432, 439 (6th Cir. 2009); *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000); *Rambus, Inc. v. Infineon Technologies AG*, 220 F.R.D. 264, 272 (E.D. Va. 2004). But, the parties disagree with respect to the proper standard in this jurisdiction that governs the determination of whether a document has been prepared in anticipation of litigation, within the meaning of Rule 26(b)(3). Plaintiffs urge this court to apply the "because of" test, while the Insurers urge the court to apply the "primary motivating purpose" formulation.

The work product doctrine applies to material prepared prior to the commencement of litigation, so long as there is "'some possibility of litigation.'" *APL Corp. v. Aetna Cas. & Sur. Co.*, 91 F.R.D. 10, 15 (D. Md. 1980) (quoting *In re Grand Jury Investigation,* 599 F.2d 1224, 1229 (3d Cir. 1979)). Nevertheless, "while litigation often results from an insurance company's denial of a claim, it cannot be said that any document prepared . . . after such a claim has arisen

---

[7] At least for purposes of the present dispute, the Insurers do not argue that they have a "substantial need for the materials to prepare [their] case and cannot, without undue hardship, obtain their substantial equivalent by other means," under Rule 26(b)(3)(A)(ii). Therefore, I need not consider that exception to work product protection.

is prepared in anticipation of litigation. . . ." *APL*, 91 F.R.D. at 17. Rather, the documents in issue must have been prepared "'*because* of the prospect of litigation.'" *Id.* at 20 (citation omitted; emphasis in *APL*).

The "because of" test, on which Millennium relies, asks "'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010) (citation omitted). With the exception of the Fifth Circuit, it appears that all of the circuits that have addressed the matter, including the Fourth Circuit, have adopted the "because of" test. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 985 (4th Cir. 1992) ("The document must be prepared *because* of the prospect of litigation when the [party asserting work product protection] faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation.") (emphasis in original); *see also*, *e.g.*, *Deloitte*, 610 F.3d at 136; *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 622 (7th Cir. 2010); *Prof'ls Direct*, 578 F.3d at 439 (citing *United States v. Roxworthy*, 457 F.3d 594 (6th Cir. 2006)); *In re Grand Jury Subpoena,* 357 F.3d 900, 907 (9th Cir. 2004); *PepsiCo, Inc. v. Baird, Kurtz & Dobson LLP,* 305 F.3d 813, 817 (8th Cir. 2002); *Maine v. U.S. Dept. of the Interior,* 298 F.3d 60, 68 (1st Cir. 2002); *Montgomery County v. MicroVote Corp.*, 175 F.3d 296, 305 (3d Cir. 1999); *United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998).[8]

Commentators who have addressed the work product doctrine also give credence to the "because of" test. In 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2024, at 502 (3d ed. 2010), the authors state that "the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Moreover, Epstein provides a gloss on the "because of" test, explaining that the test focuses on "whether the document would have been prepared regardless of whether litigation was also in the offing." Epstein at 855. Epstein elaborates: "If it would have been prepared regardless of whether litigation was in the offing, then there is generally no reason to accord the document work-product protection. If, however, the document would not have been prepared in the ordinary course of business or for any other *independent business purpose* . . . then there is generally no reason to accord the document work-product protection." *Id.* (emphasis in Epstein).

In contrast, the Insurers urge the application of the "primary motivating purpose" test. The Fifth Circuit's more restrictive "primary motivating purpose" test affords protection only if "the primary motivating purpose behind the creation of the document was to aid in possible future litigation." *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981) (Unit A); *accord In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000); *United States v. El Paso Co.*, 682 F.2d 530, 542-43 (5th Cir. 1982).

---

[8] To my knowledge, the Tenth Circuit has not addressed the issue.

In my view, the "because of" test, articulated by the Fourth Circuit in *National Union*, *supra*, 967 F.2d 980, applies here.[9] In *National Union*, the Fourth Circuit directed the district court to "determine, from an examination of the documents or their circumstances, whether they were prepared in anticipation of litigation or for trial. If so, and if the documents embody opinions and theories about the litigation, discovery is refused. . . . ." 967 F.2d at 985. The appellate Court made clear that "anticipation of litigation" means that the document must have been "prepared *because* of the prospect of litigation," and not in the "ordinary course of business." *Id.* (emphasis in original).

The Insurers concede that, at the time of the NMB Communications, coverage had been denied. However, they contend that plaintiffs were "in the process of preparing a formal presentation of their claim to their insurance companies, not preparing to litigate." Insurers Brief at 3. They point out that, at plaintiffs' request, Marsh had obtained an extension to December 2008, to augment the proof of loss. Moreover, the Insurers note that on September 11, 2008, less than a week before the first of the NMB Communications was sent, Mr. Koutras and others met with representatives of Marsh for the express purpose of discussing the claim and "what needed to be done to respond to the denial letter and file their proof of loss." Ex.C to Insurers Brief

---

[9] The Insurers cite a decision of this Court, *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B*, 230 F.R.D. 398 (D. Md. 2005), for the proposition that the work product doctrine "generally does not apply, unless the primary motivating purpose for creating the document is to assist in pending or impending litigation." *Id.* at 418. (In so stating, the *Neuberger* Court relied on two decisions from the District of Kansas, situated in the Tenth Circuit. As noted, the Court of Appeals for the Tenth Circuit has not yet adopted either the "because of" test or the "primary motivating purpose" test.)

The Insurers suggest that *Neuberger* is a "controlling precedent" that compels the conclusion that this district has adopted the "primary motivating purpose" test. Insurers Supp. at 1-2. I disagree, for two reasons. First, regardless of *Neuberger*, I am bound to follow and apply the decisions of the Fourth Circuit, which has endorsed the "because of" standard in *National Union*. Second, *Neuberger* does not involve the same fact pattern as this case, in which the Insurers essentially concede that potential litigation may have been *one* reason for the preparation of the documents at issue. The Insurers note that they "assume every insured contemplates litigation when a claim such as this is initially denied." Insurers Brief at 4. The Insurers argue that litigation was not *the primary* reason for the NMB Communications, merely because Millennium was also preparing to supplement its claim submission to the Insurers in the hope that the Insurers would reconsider their denial of coverage.

In *Neuberger*, the court rejected a claim of work product protection for all documents prepared by an attorney "in the planning stage of a takeover attempt," without any indication that litigation was actually reasonably anticipated. *Neuberger*, 230 F.R.D. at 408. *Neuberger* did not consider whether work product protection applied to documents prepared at a time when litigation was looming on the horizon but other reasons for creation of the documents arguably existed as well. Thus, *Neuberger* cannot bear the weight the Insurers place upon it to support their contentions that litigation must be *the only primary reason* for creation of a document if it is to be eligible for work product protection, and that the doctrine has no application to a document prepared with two significant contingencies in mind, one of which is litigation.

- 8 -

(ECF 72-4). On this basis, the Insurers assert: "Clearly, at this point, Mr. Koutras' motivation was to seek support for Plaintiffs' proof of loss, not litigate." Insurers Brief at 3.

The Insurers also cite Millennium's continuing efforts, in November 2008, to compile additional information for submission to the Insurers in connection with their original insurance claim. Thus, the Insurers maintain that, even at this point, "Plaintiffs' focus was still on presenting their claim, not on instituting litigation." *Id.* at 4. Then, on December 31, 2008, plaintiffs submitted the formal claim, consisting of an eleven and a half page, single spaced letter, signed by Mr. Koutras, disputing, in detail, the Insurers' position, and urging AIG to "reconsider its declination of coverage for [plaintiffs'] losses." Ex.I to Insurers Brief at 12 (ECF 72-10). The Insurers further observe that Millennium did not file suit until July 2009, many months after the NMB Communications were made in September 2008, and several months after the second denial of the plaintiffs' claim in February 2009. *Id.*

Noting that Mr. Lambert's email of September 17, 2008, "was not prepared by an attorney," and claiming that "it certainly was not prepared at the direction of an attorney in anticipation of litigation," the Insurers contend that Mr. Lambert was merely "giving his opinion on the claim with the added incentive of NMB's potentially increasing its business portfolio." *Id.* at 5. Thus, the Insurers argue that the "motivating purpose" of the NMB Communications was "geared toward determining how to present Millennium's claim to the insurance companies and potentially vetting NMB to be Plaintiffs' new property insurance broker," and "not to assist with prospective litigation…." *Id.*

The Insurers also make much of the fact that Wylie made Lambert available for consultation with Koutras, contending that Wylie offered Lambert's services as part of a "concerted effort to wrest [Millennium's] insurance business away from Marsh." Insurers Supp. at 4. According to the Insurers, "the NMB Communications had nothing to do with litigation and everything to do with NMB's strong desire to displace Marsh and insert itself as [Millennium's] broker." *Id.* at 5.

In an affidavit of March 24, 2011, Mr. Koutras avers that, even before the issuance of the Insurers' first denial letter on July 31, 2008, "word had already gotten back to Millennium through Marsh that the claim was going to be denied . . . ." Koutras Aff. ¶ 8, Ex.1 to Millennium Supp. (ECF 80-1). He explains that, as a result, Millennium "began preparations for contingent litigation against the Insurer Defendants." *Id.* Indeed, according to Koutras, as early as July 24, 2008, Millennium "began to specifically contemplate litigation as a viable option if the Insurer Defendants continued to deny coverage." *Id.* ¶ 9. These assertions are supported by the handwritten notes of Mr. Williams, dated July 24, 2011, discussed *supra*, which reflect Millennium's awareness that the Insurers planned to deny coverage and state that "suit" is one of Millennium's planned responses. Ex.C to Millennium Supp. Moreover, over a month before the NMB Communications, Koutras directed Millennium's outside counsel, K & L Gates, to "be prepared to file a coverage action should AIG continue its denials" and to prepare a budget for litigation. Ex.D & E to Millennium Supp.

Notably, in his affidavit, Koutras explains that, in light of the "expected continued denial of our claim, [he] subsequently engaged in communications with [NMB] in order to further

develop Millennium's legal strategy." Koutras Aff. ¶ 18. He posits that he emailed Lambert at NMB on September 15, 2008, "to seek input from an insurance industry partner, not involved whatsoever in the underlying claim, on technical provisions of the . . . policy in the context of the loss." *Id.* ¶ 19. According to Koutras, the NMB Communications "were part of Millennium's preparation for potential litigation." *Id.* ¶ 21. He adds: "I sought Mr. Lambert's assistance because of the prospect of litigation with Insurer Defendants and not for any other reason." *Id.* ¶ 22.

In his supplemental affidavit, submitted on April 14, 2011, Koutras seeks to contextualize Wylie's emails offering Lambert's services. *See* Koutras Supp. Aff. (ECF 97-1). Koutras states that he "placed a telephone call to Mr. Wylie on August 14, 2008," concerning the unrelated insurance claims NMB was handling for Millennium. Koutras Supp. Aff. ¶ 9 (ECF 97-1). Koutras states that, during the conversation, he "informed Mr. Wylie [that he] was seeking someone who could assist [him] on certain aspects of the policies issued by the Insurer Defendants." *Id.* Koutras also asserts that Wylie subsequently "identified and recommended Mr. Lambert in response to my earlier request," which ultimately led to the NMB Communications. *Id.* ¶ 12.

Koutras also disputes the Insurers' claim that the NMB Communications arose from NMB and Wylie's attempt to "wrest" business from Marsh, stating that "there was no additional business" for NMB "to obtain because the RFP process had previously concluded." *Id.* ¶ 7. He insists that Lambert was not "consulted to advise Millennium on the presentation of the claim" and that "Millennium <u>did not need</u> NMB's assistance to present the claim," because that was Marsh's responsibility as the broker on the policy. Koutras Aff. ¶ 24. Further, Koutras maintains that, at the time of the email exchange, he regarded the presentation of the claim "to largely be futile," as Millennium had been informed by Marsh that, based on the facts, "coverage would continue to be denied," and he was "not aware of any facts we could present . . . that were going to change their mind, and, accordingly, I expected that litigation was likely to occur." *Id.* As noted, the Insurers' internal emails of this time period confirm Koutras's view that Millennium's arguments were unlikely to alter the Insurers' decision.

Upon an examination of the documents and their circumstances, and applying the standard set forth in *National Union*, I am amply satisfied that the email communications in issue were prepared because of impending litigation, and contain protected work product opinions about the dispute.

As the facts plainly show, at the time of the exchange, the Insurers had already rejected the claim of coverage, by way of a thorough, comprehensive letter. It was clear to all that millions of dollars were (and are) at stake. Although Millennium continued to pursue vigorously its claim with the Insurers, it is equally clear that it was fighting a war on at least two fronts. Recognizing the uphill battle, Millennium was actively pursuing a litigation strategy at the same time that it intended to make an additional submission to the Insurers.

By July 24, 2008, the handwritten notes of Robert Williams, Millennium's former Treasury Director, reflect consideration of a lawsuit. And, prior to the email exchange in issue, Koutros had contacted outside counsel, expressly indicating that the "planned path" included a

coverage action if AIG persisted in its denial. Further, by August 2008, Koutras had asked outside counsel to prepare a litigation budget. Then, in an email of September 15, 2008, Lambert asked Koutras for an "outline as to causation, loss, etc.," noting that he had been asked to provide an "evaluation." And, in response, on the same date, Koutras set forth his presentation and organization of the facts, without any mention that Millennium sought to procure insurance from NMB. It is also clear that Koutras, as corporate counsel, was acting in his capacity as a lawyer.

To the extent that the parties disagree as to the motivations of Lambert (and Wylie and NMB) with regard to the NMB Communications, I need not resolve their dispute. It is Koutras's motivation, and not Lambert's, that is relevant. The question is whether Koutras requested Lambert's analysis in anticipation of litigation. In my view, it is clear that Koutras would not have sought Lambert's advice "regardless of whether litigation was in the offing." Epstein at 855. Put another way, the NMB Communications "would not have been prepared in the ordinary course of business or for any other independent business purpose," *id.* (emphasis omitted), if Koutras were not exploring all of Millennium's options, including both litigation and further attempts at persuasion, so as to address the Insurers' denial of its claim.

In sum, the Court is convinced that the NMB Communications "embody opinions and theories about the litigation," and were "prepared because of the prospect of litigation." *National Union*, *supra*, 967 F.2d at 985. Accordingly, they are entitled to work product protection and are not subject to disclosure in discovery.

Despite the informal nature of this Memorandum, the Clerk is directed to flag it as an opinion. An Order consistent with this Memorandum follows.

Very truly yours,

/s/
Ellen Lipton Hollander
United States District Judge