IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MILLENNIUM INORGANIC CHEMICALS LTD, *et al.*, | * | |
| | * | |
| *Plaintiffs*, | | |
| vs. | * | Civil Action No.   ELH-09-1893 |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, *et al.*, | * | |
| | * | |
| *Defendants*. | | |
| | * | |
| ****** | | |

MEMORANDUM

Now pending before the Court is the "Motion To Strike Paragraphs 18-25, 27, and 33 Of The Report Of Plaintiffs' Rebuttal Expert Mark Chatfield And Mr. Chatfield's Related Deposition Testimony" ("Motion to Strike," ECF 122), filed by National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") and ACE American Insurance Company ("ACE") (collectively, "Insurer Defendants").  Plaintiffs, Millennium Inorganic Chemicals Ltd. and Cristal Inorganic Chemicals Limited (collectively, "Millennium"), filed an opposition to the Motion ("Opposition," ECF 132), to which the Insurer Defendants have replied ("Reply," ECF 134).  No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.

This case involves a multi-million dollar business interruption loss sustained by Millennium, a global titanium dioxide manufacturer whose facilities include a site near Bunbury, Western Australia.  Millennium temporarily closed its Bunbury operations for approximately three months following a natural gas explosion on June 3, 2008, at the Varanus Island facility of a gas producer, Apache Energy Limited ("Apache").  The explosion, which occurred off the

coast of Western Australia, disrupted the receipt of natural gas by Millennium. At the relevant time, Millennium had a contract with Alinta Sales Pty Ltd. ("Alinta") relating to delivery of natural gas and, because of the gas explosion, Alinta was unable to deliver gas to plaintiffs.

As a result of the economic losses sustained by Millennium due to the interruption in gas supply, plaintiffs sought coverage under first-party property policies issued by National Union and ACE. The policies in issue provide coverage for losses as a result of damage to "direct suppliers of materials to the Insured's locations." *See* ECF 122 at 2. After coverage was denied, Millennium filed suit against the Insurer Defendants for breach of contract, declaratory relief, and bad faith denial of coverage. ECF 1.[1]

The Insurer Defendants insist that "Alinta is the direct supplier of natural gas to the relevant Insured location." ECF 122 at 2. Because the explosion on Varanus Island caused damage to Apache, not Alinta, the Insurer Defendants maintain that they are not liable under the insurance policies. Millennium counters that Alinta is an "aggregator" and "trader" of natural gas, and "merely arranged for the bulk purchase and transport of gas" from Apache to "end users like Millennium." ECF 132 at 2. In their view, Apache was the direct producer and supplier of natural gas to Millennium within the meaning of the insurance policies.

In accordance with the Court's Scheduling Order of July 25, 2011 (ECF 106), the Insurer Defendants identified Barrie Brandt, of Evans & Peck, as an expert on "the processes involved in the sale and transportation of natural gas in Western Australia, as it may relate to the supply and sale of gas by Alinta . . . to Millennium ..." *See* "Report on the Delivery of Gas to the South West of Western Australia," dated September 29, 2011 (ECF 122-1) ("Brandt Report"). In response to

---

[1] Plaintiffs also sued Marsh USA Inc. ("Marsh"). Marsh is not involved in this discovery dispute.

the Brandt Report, plaintiffs filed a Rebuttal Rule 26(a)(2) Expert Disclosure, and produced the report of their expert, Mark Chatfield.  *See* ECF 122-2 ("Chatfield Report").

The Insurer Defendants challenge certain paragraphs of the Chatfield Report, and corresponding portions of Mr. Chatfield's deposition testimony.  They complain that the content of the Chatfield Report exceeds the scope of proper rebuttal testimony; contains legal conclusions; and articulates conclusions concerning lay matters that are solely within the province of the jury.  *See* ECF 122 at 3.  In particular, the Insurer Defendants contend that the Chatfield Report "goes well beyond the subject matter of Mr. Brandt's report," *see* ECF 122-4 (letter of November 7, 2011, from John Mezzacappa, Esquire to John Celeste, Esquire).[2]  Noting that Mr. Brandt never provided an opinion on whether "Apache or Alinta is a direct supplier of Millennium," *see* Reply, 134 at 4, they insist that Mr. Chatfield improperly expresses the "opinion that the Varanus Island Joint-Venturers are direct suppliers of gas to Millennium," and that Alinta was not the "direct supplier" of natural gas to Millennium at the time of the explosion.  *See also* ECF 122-4 (letter of November 7, 2011).  Further, they point to the discussion of the specifics of the Varanus Island incident.

In addition, the Insurer Defendants complain that, at Mr. Chatfield's deposition, plaintiffs' counsel "obstructed a line of questioning regarding Alinta's status as Millennium's natural gas supplier, including instructing Mr. Chatfield not to answer without asserting that any privilege applies, thus allowing patently evasive answers to stand unchallenged, and halting appropriate probing into the new opinions that were inappropriately offered as rebuttal." "Memorandum Of Law In Support Of Motion To Strike Paragraphs 18-25, 27, and 33 Of Report Of Plaintiffs' Rebuttal Expert Mark Chatfield and Mr. Chatfield's Related Deposition

---

[2] Exhibit 4 includes several exchanges between counsel.

Testimony" ("Memorandum," ECF 123 at 7).  In their view, plaintiffs' counsel engaged in "repeated unwarranted and improper interruptions of Mr. Mezzacappa's line of questioning," which "clearly influenced the witness" and "prevented adequate inquiries into the issue of Millennium's gas supplier." *Id.* at 13.  On this basis, they urge the Court to impose a sanction of "precluding Mr. Chatfield's testimony on the subject." *Id.*

Plaintiffs dispute the Insurer Defendants' contentions that the Chatfield Report constitutes improper rebuttal to the Brandt Report.  They also argue that a motion to strike is not the "proper procedural vehicle" to challenge the Chatfield Report.  In addition, they claim that the Motion to Strike was untimely filed.  *See* ECF 132 at 5.[3]  And, they maintain that the conduct of plaintiffs' counsel at the deposition of Mr. Chatfield was both appropriate and justified.

The curriculum vitae of Barrie Brandt reflects that he is an executive consultant of Evans & Peck.  *See* ECF 122-1 at 19.  The Brandt Report indicates that National Union and ACE "engaged Evans & Peck to prepare a report to outline the processes involved in the sale and transportation of natural gas in Western Australia, as it may relate to the supply and sale of gas by Alinta Sales Pty Ltd to Millennium Inorganic Chemicals Pty Ltd . . ." Brandt Report at ¶1.  Further, ¶ 17 of the Brandt Report states:  "National Union and ACE, through Counsel, have engaged Evans & Peck to advise on the process of gas delivery to Millennium's facilities." Similarly, the Insurer Defendants' F. R. Civ. P. 26(a)(2) expert disclosure states, in part:  "Mr. Brandt . . . is expected to testify and render opinions regarding the processes involved in the sale and transportation of natural gas in Western Australia, *as it may relate to the supply and sale of gas by Alinta . . . to Plaintiffs' Bunbury's facilities*." *See* ECF 132-1, at ¶ 3 p.2 (emphasis

---

[3] Because I resolve the dispute on the basis of the scope of the Chatfield Report, I need not address plaintiffs' procedural arguments.

added).  According to the Brandt Report, it "explains, at a high level, the normal processes involved in the supply, sale, and purchase of gas in Western Australia, *as applicable to the sale and delivery of gas to Millennium*."  Brandt Report, ¶ 18 (emphasis added).

In my view, the subject area addressed in the Chatfield Report is clearly responsive to the Brandt Report.  I reject the narrow construction of the phrase "same subject matter" within the meaning of Fed. R. Civ. P. 26(a)(2)(D)(ii), which the Insurer Defendants urge the Court to embrace.  I also reject their contention that the Brandt Report does not address the issue of whether Alinta was a gas supplier.

To be sure, the Brandt Report indicates:  "It has been prepared without reference to Millennium's specific contractual arrangements."  Brandt Report, ¶ 61.  Notwithstanding that disclaimer, it is patently evident that the Brandt Report proceeds to address the source and delivery of gas by Alinta to Millennium.  The decision of Mr. Brandt not to consider the specifics of the contractual documents  between Alinta and Millennium does not alter the import of his report.  Directly and indirectly, the Brandt Report casts Alinta as the entity with custody, possession, title, and ownership of the natural gas, supporting the Insurer Defendants' position that Alinta was the "supplier" of natural gas to Millennium and Apache was merely the producer.

Indeed, the Brandt Report is replete with references suggesting that Alinta was the supplier.  The following excerpts are illustrative:

- Brandt Report, ¶ 5: "A significant quantity of gas is purchased by Alinta Sales Pty Ltd, in its role as a *gas utility*, for **supply** and sale . . . to industrial customers." (Boldface added).

- Brandt Report ¶ 6: "Historically, Alinta was the sole gas utility, responsible for the **supply** and sale of gas to most industrial users." (Boldface added).

- Brandt Report ¶ 9: "At these inlet points, which are called *Delivery Points* in the gas supply agreements, ownership, title, custody, and risk changes from the gas producer

5

to the customer, eg: Alinta."

- Brandt Report ¶ 12: "Here, the pipeline customer, in this case Alinta, takes responsibility, custody and possession of the gas."

- Brandt Report ¶ 13: ". . . the gas customer, in this case Alinta, redelivers it to the owner of the gas distribution system."

- Brandt Report ¶ 14: "Alinta takes delivery of the gas from WA Gas Networks and delivers it to its [Alinta's] customer, Millennium Inorganic Chemicals. Ownership, title, custody and risk for the gas transfer from Alinta to Millennium at that delivery point."

- Brandt Report ¶ 16: "The gas is purchased from and **supplied** [to Millennium] by Alinta Sales Party Limited, Western Australia's largest gas utility." (Boldface added).

- Brandt Report ¶ 29: "Alinta … is the largest gas utility, onselling to a range of domestic, commercial and industrial customers . . . Millennium would be regarded as an *industrial* customer."

- Brandt Report ¶ 32: "Millennium's gas is delivered by Alinta from the WAGN distribution system."

- Brandt Report ¶ 37: "Ownership of the gas changes from the producers to the gas customers, in this case, Alinta, at these delivery points."

- Brandt Report ¶ 46: "Ownership of the gas in the DBNGP is retained by the pipeline customer, in this case, Alinta."

- Brandt Report ¶ 54: "End gas customers or gas retailers, eg: Alinta, contract with the distribution operator for the distribution of gas to the retailers' customers."

- Brandt Report ¶ 56: "Ownership of the gas is retained by the distribution system customer, in this case, Alinta."

- Brandt Report ¶ 60: "The utility, in this case, Alinta, will contract with the gas producer, the transmission pipeline and the distribution company to provide a single point contract for their customers."

- Brandt Report ¶ 64: "Alinta would purchase gas from both the NWSV . . . and from Apache (from Varanus Island) under a gas supply agreement . . . ."

- Brandt Report ¶ 65: "Alinta would take delivery of gas at the relevant *delivery point* in the gas supply agreements."

6

- Brandt Report ¶ 66: "At the delivery point under the gas purchase agreement, responsibility, custody and risk change from the gas producer to Alinta. Importantly, ownership changes to Alinta at this point."

- Brandt Report ¶ 69: "It is understood that ownership of the gas remains with the pipeline customer, in this case, Alinta."

- Brandt Report ¶ 77: "Alinta would retain ownership of its gas in the distribution system. Ownership would transfer from Alinta to Millennium on delivery to Millennium."

The assertions in the Brandt Report, set forth above, unequivocally demonstrate that the Brandt Report endeavors to establish that Alinta was the direct supplier of natural gas to Millennium at the time of the explosion, even if those precise words were not used in the report. Clearly, the Chatfield Report endeavors to refute that contention by showing that Alinta was not the direct supplier. Without question, the Brandt Report and the Chatfield Report relate to the same subject matter, as required by F. R. Civ. P. 26(a)(2)(D)(ii). Indeed, there is an obvious "nexus between the purported rebuttal evidence and the evidence that the purported rebuttal evidence seeks to rebut." *United States v. Stitt*, 250 F.3d 878, 897 (4th Cir. 2001). Therefore, the argument that the Chatfield Report is beyond the scope of the Brandt Report is completely without merit.

Nonetheless, this general conclusion does not end the inquiry. I must also consider the specific paragraphs of the Chatfield Report that are in dispute.

Paragraphs 18 through 21 of the Chatfield Report merely state background facts relating to the incident, which are undisputed. Moreover, these paragraphs contain background facts of a kind that experts generally may consider and that must be disclosed. *See* F.R. Civ. P. 26(a)(2)(B)(ii) (requiring disclosure by experts of facts and data considered by the expert in formulating an opinion); *see also* Rule 703 of the Federal Rules of Evidence ("F.R.E.") ("The

7

facts or data in the particular case upon which an expert bases an opinion or inference may be those . . . made known to the expert. . . .").

Nor is there a basis to strike Paragraphs 32-25, 27, and 33. To illustrate, in ¶ 33 of the Chatfield Report, Mr. Chatfield opines: "The Varanus Island facilities were clearly the direct supplier of gas to around 30% of the gas market at that time. . . ." Further, he opines: "The presence of a gas trader such as Alinta Sales Pty Ltd . . . does not change the fundamental position that the facilities on Varanus Island, owned by their respective joint venture participants, were the direct suppliers of natural gas to Millennium Inorganic Chemicals."

F.R.E. 704(a) expressly provides that opinion testimony is not objectionable "because it embraces an ultimate issue to be decided by the trier of fact." Of course, an expert may not give testimony regarding a legal conclusion. *Safeway, Inc. v. Sugarloaf Partnership, LLC,* 423 F. Supp. 2d 531, 539 (D. Md. 2006) ("Evidence supplied by experts as to legal conclusions is not admissible . . ."); *see also United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) ("Expert testimony that merely states a legal conclusion is less likely to assist the jury in its determination."); 5 MICHAEL H. GRAHAM, HANDBOOK OF FEDERAL EVIDENCE § 704.1, at 603 (7th ed. 2012) ("GRAHAM").

The ultimate dispute in this case concerns insurance coverage. In the context of this case, a legal conclusion would address the question of whether plaintiffs are or are not entitled to coverage under the terms of the applicable insurance policies. The Chatfield Report expresses no legal conclusion regarding insurance coverage. *See, e.g.*, *Schneider v. Continental Cas. Co.*, 989 F.2d 728, 731 (4th Cir. 1993) (concluding that court improperly considered expert opinions that alleged errors or omissions fell outside the policy exclusion). Opinion testimony as to whether Alinta was or was not a supplier of gas to Millennium is not a legal conclusion. "'An

expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was or was not satisfied.'" *Atkinson Warehousing & Distribution, Inc. v. Ecolab, Inc.*, 99 F. Supp. 2d 665, 670 (D. Md. 2000) (quoting *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997)).

In this regard, it is noteworthy that there is no distinct meaning in the law attached to the words "direct supplier." *See* GRAHAM § 704.1 at 634 (stating that experts may be prohibited from offering opinions as to whether a standard with a "separate, distinct, and specialized meaning in the law" has been met); *see generally id.* at 603-651. The term "direct supplier" does not track the language of a legal principle at issue. *See United States v. Perkins*, 470 F.3d 150, 158-60 (4th Cir. 2006) ("The district court should first consider whether the question tracks the language of the legal principle at issue or of the applicable statute; then, the court should consider whether any terms employed have a specialized legal meaning."). *See also Torres v. County of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985) (stating that the "best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate," and concluding that expert testimony as to whether the plaintiff "had been discriminated against" was improper because "discrimination" has a specialized legal meaning in a Title VII case).

The Insurer Defendants also maintain that the phrase "direct supplier," at issue here, "is not the type of technical term of art requiring an expert's opinion." ECF 123 at 16. I disagree. The words themselves may not seem complicated, but the facts of the case are technical and specialized and not within the general understanding of a lay person. Indeed, the competing expert reports make clear that delivery of natural gas in Western Australia to an end user such as

Millennium requires extensive explanation with respect to the processes involved. To that end, the Defendant Insurers retained Evans & Peck to prepare a report to outline the processes pertaining to sale, transportation, and delivery of natural gas in Western Australia. Similarly, the Chatfield Report endeavors to explain the complicated process by which natural gas is delivered to an end user.

F.R.E. 702 permits an expert to render opinions on "scientific, technical, or other specialized knowledge" if such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue. . . ." As the Fourth Circuit recently said in *United States v. Ofill*, ___ F.3d ___, 2011 WL 6034788, at *4 (4th Cir. Dec. 6, 2011), "The touchstone of the rule is whether the testimony will assist the jury." In my view, the experts' testimony will prove extremely useful to a jury in elucidating the processes involved, and falls well within the purview of F.R.E. 702.

Finally, I turn to the defense's complaints regarding the conduct of plaintiffs' counsel during Mr. Chatfield's deposition. Notwithstanding Mr. Chatfield's express conclusion that "the facilities on Varanus Island . . . were the **direct suppliers** of natural gas to Millennium Inorganic Chemicals," *see* Chatfield Report ¶ 33 (emphasis added), and despite the repeated statements in the Chatfield Report to the effect that Alinta was not the "supplier," *see*, *e.g.*, Chatfield Report ¶ 27, counsel for plaintiffs repeatedly insisted, during the questioning of his own expert, who had frequently used the term "supplier" in his report, that defense counsel should define the term "supplier." As I see it, it was not incumbent on defense counsel to define for the expert a term that was repeatedly used by the expert. Mr. Chatfield plainly had a conception of the meaning of the term "supplier," because he used the term throughout his report. Defense counsel was entitled to explore with the expert his usage of the term.

Moreover, it was perfectly appropriate for defense counsel to explore fully with Mr. Chatfield his understanding of why Alinta was not a supplier to Millennium. During the deposition, however, plaintiffs' counsel instructed Mr. Chatfield not to answer further questions on the topic.

It is generally improper to instruct a witness not to answer questions during depositions. *See* Rule 26(b)(1); *Ralston Purina Co. v. McFarland*, 550 F.2d 967, 973 (4th Cir. 1977). Under Fed. R. Civ. P. 30(c)(2), there are three circumstances in which a lawyer may instruct a witness not to answer at a deposition: protection of a privilege; enforcement of a judicial limitation on evidence; or in anticipation of a motion for protective order barring questions presented in bad faith, or to embarrass, annoy, or harass the deponent. Guideline 6(b) of Appendix A to our Local Rules states: "[I]t is presumptively improper for an attorney to make objections which are not consistent with Fed. R. Civ. P. 30(c)(2)." Further, it provides that objections should be stated so as to avoid coaching the deponent and "to minimize interruptions in the questioning . . . ." *Id.* And, Guideline 6(b) also makes clear that it is presumptively improper to instruct a deponent not to answer, except in conformance with Rule 30(c)(2). In my view, none of the circumstances of Rule 30(c)(2) were evident at Mr. Chatfield's deposition.

Conversely, Guideline 6(c) instructs: "An attorney should not repeatedly ask the same or substantially identical question of a deponent if the question already has been asked and fully and responsively answered. . . ." Moreover, it is presumptively improper for a lawyer to do so, unless the answer was "evasive or incomplete."

Although the questioning by defense counsel was not abusive in tone, and he was undoubtedly frustrated by repeated interruptions, his line of inquiry persisted after Mr. Chatfield had answered several questions regarding Alinta's status as a supplier. To illustrate, Mr.

11

Chatfield made clear that he viewed Alinta "purely [as] a seller." *See* ECF 122-3, at 92, line 2. He also explained: "They don't produce and supply, they sell." *Id.* at lines 2-3. Further, Mr. Chatfield stated: "I have done my best to try and explain the operation of the various entities in the [Western Australia] gas chain. . . . And I've identified that in my mind Alinta participates in that process in only two places. To buy gas and arrange for it to be transported and it sells that gas at the point of delivery." *Id.*; lines 13-20.

     As I see it, counsel for both sides veered from the Local Rules. However, neither side was prejudiced, and no sanctions are warranted.


<u>January 27, 2012</u>                                    <u>/s/</u>
Date                                                   Ellen Lipton Hollander
                                                       United States District Judge