IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MILLENNIUM INORGANIC
CHEMICALS LTD., *et al.*,

    *Plaintiffs*,

v.

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PA, *et al.*,

    *Defendants*.

Civil Action No. ELH-09-1893

## MEMORANDUM OPINION

Millennium Inorganic Chemicals Ltd. ("Millennium Inorganic") and Cristal Inorganic

Chemicals Ltd. ("Cristal Inorganic") (collectively, "Millennium"), plaintiffs, sued two of their

"All-Risks" insurers, National Union Fire Insurance Company of Pittsburgh, PA ("National

Union") and ACE American Insurance Company ("ACE") (collectively, the "Insurers"), after the

Insurers denied coverage for business interruption losses that plaintiffs sustained due to the loss

of natural gas supply to their titanium dioxide production facilities in Western Australia.

Plaintiffs allege that they incurred a loss of over $10 million due to the business interruption.[1]

The loss of natural gas supply was caused by a massive explosion that occurred on June

3, 2008, at a natural gas production facility on Varanus Island, off the coast of Western Australia,

---

[1] Plaintiffs also sued Marsh USA, Inc. ("Marsh"), the insurance broker that procured the policies at issue, but subsequently dismissed their claims against Marsh. *See* ECF 144 (stipulation of dismissal). Subject matter jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332(a)(2). All of the defendants are incorporated and have their principal places of business in various American states, while both plaintiffs are incorporated and have their principal places of business in foreign countries. In a ruling issued on February 3, 2010, Judge Catherine C. Blake denied the Insurers' motion to dismiss based on the doctrine of *forum non conveniens*. *See* ECF 37 & 38. The case was reassigned to me on January 13, 2011.

operated by a joint venture led by Apache Corporation ("Apache").  The explosion completely shut down Apache's gas production on Varanus Island, which accounted for approximately 30% of the natural gas supply to all of Western Australia.  Immediately after the explosion, the supply of natural gas to plaintiffs' facilities was terminated and, without natural gas, plaintiffs were forced to suspend production of titanium dioxide.  Shortly after the explosion, Millennium submitted a claim to the Insurers for coverage under the applicable policies.  The claim was denied in February 2009.

Plaintiffs' suit, filed in July 2009, contains three counts against the Insurers.[2]  Count I seeks a declaratory judgment that Millennium is entitled to coverage under the policies for business interruption losses arising out of the Varanus Island explosion.  Count II asserts a claim for breach of contract under the insurance policies.  Finally, Count III alleges a cause of action under Md. Code (2006 Repl. Vol., 2012 Supp.), § 3-1701 of the Courts & Judicial Proceedings Article ("C.J."), for failure to act in good faith in denial of insurance coverage.

The principal question on which insurance coverage turns is whether Apache's Varanus Island natural gas production facility was a "direct contributing property" to plaintiffs' titanium dioxide production facilities, despite the fact that plaintiffs purchased the natural gas from an intermediary, Alinta Sales Pty Ltd. ("Alinta"), which, in turn, purchased natural gas from Apache and other natural gas producers for resale to end users such as Millennium.  If Apache's facility was a direct contributing property to plaintiffs, or to "others for the account of" plaintiffs, the loss comes within the contingent business interruption ("CBI") coverage provided by the insurance policies.  Otherwise, the loss is not covered.

---

[2] Plaintiffs also asserted four counts against Marsh.  But, as noted, plaintiffs dismissed their claims against the broker.

Discovery has concluded, and plaintiffs and the Insurers have filed cross-motions for summary judgment on the issues of whether coverage exists and whether the Insurers are liable for bad faith denial of coverage under C.J. § 3-1701.[3]  The motions have been fully briefed,[4] and a hearing is not necessary to resolve them.  *See* Local Rule 105.6.  For the reasons that follow, I will grant Millennium's motion and grant in part and deny in part the Insurers' motion.

## Background[5]

### A.  Millennium

Cristal Inorganic is the parent company of Millennium Inorganic.  *See* Millennium Motion at 3; Insurers' Motion at 1.  Both companies are subsidiaries of The National Titanium Dioxide Co., Ltd.  *See* ECF 2.  Millennium, together with other affiliates, is a leading global producer of titanium dioxide, a white pigment used in manufacturing a range of products such as paint, plastics, and paper.  *See* Millennium Motion at 3; Insurers' Motion at 1.  Millennium

---

[3] The parties have not addressed the amount of plaintiffs' damages, in the event that coverage exists.

[4] I have considered plaintiffs' "Motion for Partial Summary Judgment" (ECF 146) (together with its supporting memorandum, ECF 146-1, "Millennium Motion"); the Insurers' "Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment" (ECF 151) (together with its supporting memorandum, ECF 151-2, "Insurers' Motion"); plaintiffs' reply in support of its motion and opposition to the Insurers' Motion ("Millennium Reply") (ECF 156); the Insurers' Reply (ECF 157); and a multitude of exhibits submitted by the parties.  The parties moved to seal many of the exhibits; these requests are addressed, *infra*.

[5] Unless otherwise noted, the facts contained in the Background are drawn from the parties' statements of undisputed facts.  To the extent that there are disputes, they generally concern the legal significance to assign to the underlying facts, rather than the underlying facts themselves.  *See Jones v. Shinseki*, 804 F. Supp. 2d 665, 677 (M.D. Tenn. 2011) ("[D]isputes over semantics do not create a genuine issue of material fact.").  For example, the parties dispute the appropriate way to characterize certain aspects of the Western Australian natural gas industry (especially Alinta's role in it), although their disagreements as to these issues are largely semantic.  They also vigorously dispute the legal interpretation of the relevant insurance policies.

operates two interdependent plants near Bunbury, Western Australia (the "Bunbury Operations")

for the production and finishing of titanium dioxide. *See id.*; Millennium Motion at 3.

## B.  The Policies

Millennium was insured under a "Master Controlled Insurance" ("MCI") program, which

is a method of global business insurance coverage.  Millennium Motion at 6.  Such a program

provides coverage on a global basis through the issuance of "master policies," issued by insurers

in the United States, and "local policies," issued in the countries where the insured operates, in

order to comply with regulatory requirements in those countries.  *See id.*  For the 2008–2009

policy year, Millennium's MCI program was procured through its broker, Marsh.  *See id.*;

Insurers' Motion at 8.[6]  The 2008–2009 MCI program included two "All-Risks" master policies,

one issued by National Union and the other issued by ACE, as well as an Australian local policy

issued by American Home Assurance Company.[7]   *See* National Union Policy, Ex.13 to

Millennium Motion (ECF 146-15); ACE Policy, Ex.14 to Millennium Motion (ECF 146-16)

(collectively, the "Master Policies").[8]  The two Master Policies were written on substantially the

same policy forms, and each policy covered Millennium for 50% of any covered losses, up to an

---

[6] The coverage term of the Master Policies was May 16, 2008 to May 16, 2009.  Notably, although the Insurers issued binders of insurance on May 15, 2008, *see* Ex.12 to Millennium Motion (ECF 146-14), the policies themselves (which contained the precise language of the policy endorsements at issue) were not issued until after the June 3, 2008, explosion on Varanus Island.  *See Anton v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 634 F.3d 364, 370 n.4 (6th Cir. 2011) ("'An insurance binder is a contract of temporary insurance to be effective insurance coverage until a formal policy is drafted and issued.'  It is not a complete contract, but it is evidence of a contractual obligation to be expressed in final written form at a later date.") (internal citation omitted).  However, neither side contends that this timing of events affects the issues at bar.

[7] The motions for summary judgment do not concern any provisions of the local policy.

[8] I cite to the pagination of the Master Policies created by the CM/ECF filing system in the copies of the policies submitted as exhibits by Millennium.

aggregate limit of $450 million per occurrence between the policies.  *See* Millennium Motion at 7; *see also* National Union Policy at 13; ACE Policy at 6.[9]

The provisions of the Master Policies at issue are the provisions for contingent business interruption, or "CBI" coverage.  "CBI coverage is a relatively recent development and its scope has not yet been fully delineated by the courts."  *Zurich Am. Ins. Co. v. ABM Indus., Inc.*, 397 F.3d 158, 168 (2d Cir. 2005); *see also Pentair, Inc. v. Am. Guar. & Liab. Ins. Co.*, 400 F.3d 613, 615 (8th Cir. 2005) ("few reported cases have construed this type of extended business interruption coverage").  Broadly speaking, contingent business interruption insurance "gives the insured coverage for loss of sales or revenue sustained when its business is interrupted as a result of damage to property that disrupts the flow of goods and services with a supplier or customer." *Arthur Andersen LLP v. Fed. Ins. Co.*, 3 A.3d 1279, 1282 (N.J. Super. Ct. App. Div. 2010). "The word 'contingent' is something of a misnomer; it simply means that the insured's business interruption loss resulted from damage to a third party's property."  *Pentair*, 400 F.3d at 615 n.3.

Whereas ordinary "[b]usiness interruption insurance protects against the loss of prospective earnings because of the interruption of the insured's business caused by an insured peril *to the insured's own property*," contingent business interruption insurance "protects against the loss of prospective earnings because of the interruption of the insured's business caused by

---

[9] The National Union Policy was underwritten by its affiliate AIG Global Marine and Energy, while the ACE Policy was underwritten by Starr Technical Risks Agency, an independent underwriting company.  *See* Insurers' Motion at 13; Millennium Motion at 7 n.4; Ex.32 to Insurers' Motion (ECF 153-13).  The Insurers assert that National Union and ACE entered into a "facultative reinsurance" agreement by which National Union would "front" 100% of the coverage under both policies for foreign losses, and be reimbursed 50% by ACE.  *See* Insurers' Motion at 17, 25.  However, plaintiffs dispute the applicability of the reinsurance arrangement.  I need not resolve this dispute at this juncture, because the parties agree that the reinsurance arrangement does not affect the coverage dispute now at issue.  *See* Millennium Motion at 7 n.6; Insurers' Reply at 20.

an insured peril *to property that the insured does not own, operate, or control*." *CII Carbon, L.L.C. v. Nat'l Union Fire Ins Co. of La., Inc.*, 918 So.2d 1060, 1061 n.1 (La. Ct. App. 2005) (emphasis added); *accord Penton Media, Inc. v. Affiliated FM Ins. Co.*, 245 F. App'x 495, 499 (6th Cir. 2007) (quoting *CII Carbon*). In other words, "[r]egular business-interruption insurance replaces profits lost as a result of physical damages to the insured's plant or other equipment; contingent business interruption coverage goes further, protecting the insured against the consequences of suppliers' [or customers'] problems." *Archer Daniels Midland Co. v. Hartford Fire Ins. Co.*, 243 F.3d 369, 371 (7th Cir. 2001); *accord Zurich*, 397 F.3d at 168; *see also Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 394 (2d Cir. 2005) (stating that CBI coverage "reimburses [the insured] for BI losses that are caused by damages to property that is not owned by [the insured] but upon which its business depends").

The "Declarations" of both Master Policies designate the sublimits for the policies' CBI coverage, which is described as "contingent time element – direct contributing or recipient properties" coverage.[10] National Union Policy at 14 (capitalization altered); *see also* ACE Policy at 14. The policy limits are $25 million "named per occurrence" and $10 million "unnamed per occurrence." National Union Policy at 14 (capitalization altered); *see also* ACE Policy at 14. The relevant CBI coverage is established in Endorsement 8 of both Master Policies. Endorsement 8 is entitled "CONTINGENT BUSINESS INTERRUPTION [–] CONTRIBUTING

---

[10] "Time element" is essentially a synonym for business interruption coverage. *See, e.g.*, *Pentair*, 400 F.3d at 615 n.3 ("The term "time element" refers to business interruption losses . . . ."); *see also Penford Corp. v. Nat'l Union Fire Ins. Co.*, 662 F.3d 497, 499 n.2 (8th Cir. 2011) ("[W]e use the terms "business interruption loss" and "time element loss" interchangeably."). The term refers to how the insured's losses for business interruption are measured: "Time element coverage reimburses the insured for losses directly related to the period of time necessary to restore the damaged property to its normal condition." *Retail Brand Alliance v. Factory Mut. Ins. Co.*, 489 F. Supp. 2d 326, 328 n.1 (S.D.N.Y. 2007).

PROPERTY(IES) ENDORSEMENT [–] (Not Operated By The Insured)."  It is set forth using

the same endorsement form in both Master Policies, although there is one notable difference

between the policies in the manner in which the form was completed.  The operative language of

Endorsement 8 states, National Union Policy at 47 (boldface and underlining in original; italics

added):

### A.  AMOUNT OF INSURANCE:

**$(As per declarations)**  Only against loss directly resulting from necessary
interruption of business conducted on premises occupied by the Insured,
*caused by damage to or destruction of any of the real or personal property
described below and referred to as CONTRIBUTING PROPERTY(IES) and
which is not operated by the Insured*, by the peril(s) insured against during the
term of this Policy, *which wholly or partially prevents the delivery of
materials to the Insured or to others for the account of the Insured* and results
directly in a necessary interruption of the Insured's business.

### B.  SCHEDULE OF LOCATION(S):

*The following locations must be direct suppliers of materials to the Insured's
locations or coverage is deemed to be void*:

CONTINGENT

LOCATION NO.   CONTRIBUTING PROPERTY   LIMIT OF LIABILITY

### C.  COVERAGE:

Subject to all terms, conditions and stipulations of the Policy to which this
endorsement is attached, not in conflict herewith, this Policy is extended to
cover only against loss directly resulting from necessary interruption of
business conducted on premises occupied by the Insured, *caused by damage
to or destruction of any of the real or personal property described above and
referred to as CONTRIBUTING PROPERTY(IES) and which is not operated
by the Insured*, by the peril(s) insured against during the term of this Policy,
*which wholly or partially prevents the delivery of materials to the Insured or
to others for the account of the Insured* and results directly in a necessary
interruption of the Insured's business.

In the National Union Policy, as shown above, there is no text in the area of Section "B" of the endorsement designated for listing the "LOCATION(S)" of the particular "CONTRIBUTING PROPERTY(IES)" to which coverage applies.  Nor does the ACE Policy list any particular locations.  However, Section "B" of Endorsement 8 in the ACE Policy states, ACE Policy at 48 (boldface and underlining in original; italics added):

**B.  SCHEDULE OF LOCATION(S):**

*The following locations must be direct suppliers of materials to the Insured's locations or coverage is deemed to be void*:

CONTINGENT

LOCATION NO.   CONTRIBUTING PROPERTY   LIMIT OF LIABILITY

**DIRECT ONLY**                    **AS STATED IN DECLARATIONS**

C.  Millennium's Supply of Natural Gas and the Varanus Island Explosion

An uninterrupted supply of natural gas is essential to the workings of Millennium's Bunbury Operations.  *See* Millennium Motion at 3.  Natural gas provides the main source of power for both plants and is also used in process heating, steam generation, drying, and other aspects of the titanium dioxide production process.  *Id.*

In June 2008, there were two major producers of natural gas for consumption in Western Australia, as well as several minor producers.[11]  As noted, Apache (through a joint venture with

---

[11] Millennium has submitted the expert report of Mark Chatfield, an experienced professional in the Australian natural gas industry.  *See* Chatfield Report, Ex.3 to Millennium Motion (ECF 146-5).  In an earlier ruling on a discovery dispute, I reviewed an expert report regarding the composition of the Western Australian natural gas market, prepared at the Insurers' behest by Evans & Peck Pty Ltd.  *See* ECF 137.  However, the Insurers have not submitted the Evans & Peck report in connection with the pending motions.  In addition to Mr. Chatfield's

Santos (bol) Pty Ltd. and others) operated a natural gas production facility on Varanus Island, which supplied approximately 30% of Western Australia's natural gas.  *See* Millennium Motion at 4.  The other major producer was a consortium called the North West Shelf Joint Venture ("NWS"), which operated natural gas production facilities at Dampier, Western Australia.  *See* Chatfield Report at 1; Insurers' Motion at 2.  Neither Apache nor NWS produced enough natural gas on its own to satisfy demand in Western Australia.  *See* Chatfield Report at 2.

The gas produced by Apache, NWS, and other producers was injected into the Dampier-to-Bunbury Natural Gas Pipeline ("DBNGP"), a high-pressure gas pipeline that runs approximately 1,500 kilometers between northwest and southwest Western Australia.  *See* Insurers' Motion at 5.  The DBNGP is jointly owned by the DUET Group and ALCOA, and is operated as a regulated, common-carrier pipeline, charging users for transport of gas from inlet points to outlet points.  *See* Chatfield Report at 2.  The owners of the DBNGP do not sell gas to end users, nor do they purchase gas themselves (aside from a small amount of gas for their own energy needs).  *Id.* at 3.  Rather, the DBNGP obtains its revenue by providing a regulated transport service for gas.  *Id*.  The function of the DBNGP is to transport gas from the gas producers either to points of consumption (for end users who connect directly to the DBNGP) or into lower pressure gas distribution systems for further transport to end users.  *See* Chatfield Report at 2.

---

report, the evidence the parties have submitted with respect to the Western Australian natural gas market includes excerpts from Mr. Chatfield's deposition; a deposition on written questions of Graham Douglas Dryden, the Operations Manager for Apache Energy Limited (a subsidiary of Apache Corporation involved in the operation of the Varanus Island facility); and testimony of Michael Robert Riches, the Company Secretary of Alinta, taken in the Supreme Court of Western Australia under letters rogatory issued in this case.

Neither Apache nor NWS owns any gas transmission or distribution facilities downstream of the points where their gas is injected into the DBNGP.  *See id.* at 3.  Once the gas is injected into the DBNGP, it is commingled; there is no way to differentiate the gas from one producer as opposed to another.  *See* Deposition of Mark Chatfield at 23, 34-35, Ex.4 to Insurers' Motion (ECF 151-8).  Moreover, it is impossible to direct a particular producer's gas to a particular end user.  *See id.* at 38.  Rather, as plaintiffs' expert, Mark Chatfield, testified, the gas "obey[s] the fundamental law of physics.  It will flow from a high pressure area to a low pressure area.  It will go searching for flow into the direction of low pressure . . . ."  *Id.*

Although some end users of gas in Western Australia have gas purchase contracts with Apache or NWS, the majority of end users do not.  Instead, most end users contract with third parties that purchase gas in large quantities from the gas producers and sell the gas, in turn, to end users.  Alinta is this type of third party.  Indeed, it is by far the largest such entity, in terms of number of customers, in Western Australia.  Like many other end users, Millennium purchased its gas from Alinta, which in turn purchased it from Apache, NWS, and other producers.

The parties vigorously dispute how to characterize Alinta's role.  The Insurers consider Alinta a "supplier" of natural gas.  In contrast, Millennium and its expert, Mr. Chatfield, describe Alinta as a "gas trader" or "aggregator."  Regardless of the proper label for Alinta, the material facts as to what Alinta does are not disputed.  In particular, Alinta enters into contracts with the gas producers to purchase natural gas, and it sells the gas, under contracts, to end users such as Millennium.  Under Alinta's contract with Apache, Alinta takes title to the gas at the moment when the gas passes through a meter at the injection point into the DBNGP.  While the gas is in

the DBNGP, it is owned by Alinta.   But, Alinta does not own the DBNGP or any other gas transportation equipment, nor does it take physical possession of the gas.

Under Alinta's contract with Millennium, which was denominated as a "Gas Supply Agreement," Alinta agreed to provide gas to Millennium at two "delivery points" at Millennium's Bunbury Operations.   *See* Alinta-Millennium Contract at 4, Ex.5 to Insurers' Motion (ECF 153-1).   Mr. Riches of Alinta testified that most of Alinta's "medium-large industrial customers . . . including Millennium . . . take delivery of gas purchased from Alinta Sales at or immediately downstream of certain nominated outlet points on the [DBNGP]," without connecting to the low pressure gas distribution networks used by other end users.   Riches Tr. at 29.   I will discuss, *infra*, additional facts regarding Alinta's operations and the differing implications that the parties draw from the underlying facts.

As noted, an explosion at Varanus Island occurred on June 3, 2008, forcing the complete cessation of natural gas production on the island.   The same day, Apache sent a notice of force majeure to Alinta, stating that it could no longer supply Alinta with natural gas until further notice.   *See* Ex.43 to Insurers' Motion (ECF 153-22) (notice of force majeure from Apache to Alinta).   Later that day, Alinta sent a notice of force majeure to Millennium, stating that, while the disruption continued, Alinta would be "unable to supply" Millennium with any gas.   Ex.44 to Insurers' Motion (ECF 151-33) (notice of force majeure from Alinta to Millennium).

Apache did not fully resume natural gas production on Varanus Island for a number of months and, during the period that supply was curtailed, the government of Western Australia imposed controls prioritizing delivery of natural gas to domestic customers and essential services.   The parties appear to dispute the length of time that Millennium was deprived of

natural gas as a result of the Varanus Island explosion, but that dispute is not at issue in the pending motions.  Rather, the instant dispute turns on whether the CBI provisions of the Master Policies provide any coverage for Millennium's losses.

Additional facts are presented in the Discussion.

## Discussion

### A.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *News and Observer Publishing Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue.  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir.) (citation omitted), *cert. denied*, 540 U.S. 822 (2003). "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2720, at 336-37 (3d ed. 1998, 2012 Supp.).

## B.  Choice of Law

"[I]nterpretation of private contracts is ordinarily a question of state law." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989); *accord James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004); *see also French v. Assurance Co. of Am.*, 448 F.3d 693, 700 (4th Cir. 2006) (stating, in diversity declaratory action regarding insurance coverage, "we apply . . . Maryland's substantive law regarding the interpretation of an insurance policy" where the *locus contractus* of the policy was Maryland). As a preliminary matter, however, the parties dispute whether it is the substantive law of New Jersey or of New York that governs this case.[12]  Because federal courts exercising diversity jurisdiction "apply the choice of law rules of the forum state," I must consult the choice of law

---

[12] Although many of the events at issue occurred in Australia, no party argues that Australian law should govern. Nor does either side argue for application of Maryland law.

rules of Maryland, the state in which this Court is situated, to determine which state's substantive law applies.  *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)); *see also Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938)).

The Master Policies do not contain choice of law provisions.  When an insurance policy does not contain a choice of law provision, Maryland applies the doctrine of *lex loci contractus*, under which "the law of the jurisdiction where the contract was made controls its validity and construction."  *U.S. Life Ins. Co. v. Wilson*, 198 Md. App. 452, 463, 18 A.3d 110, 116 (2011); *see also Allstate Ins. Co. v. Hart,* 327 Md. 526, 529, 611 A.2d 100, 101 (1992) ("Maryland courts ordinarily should apply the law of the jurisdiction where the contract was made.").  "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs."  *Konover Property Trust, Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

"Typically, '[t]he *locus contractus* of an insurance policy is the state in which the policy is delivered and the premiums are paid,'" *Commercial Union*, 116 Md. App. at 673, 698 A.2d at 1200 (citation, emphasis, and some internal quotation marks omitted), because delivery of the policy and payment of the premium are ordinarily the last acts necessary to make an insurance policy binding.  *See Aetna Cas. & Sur. Co. v. Souras*, 78 Md. App. 71, 77, 552 A.2d 908, 911 (1989).  However, this basic rule is subject to some complications.  For instance, if an insurance broker acts as the agent of the insured, the insurer's delivery of the policy to the broker

constitutes delivery to the insured.  *Commercial Union*, 116 Md. App. at 675-76, 698 A.2d at 1201.  In that circumstance, the state where the *broker* receives the policy is the *locus contractus*. *Id.*; *accord Insights Trading Grp., LLC v. Fed. Ins. Co.*, Civ. No. RDB-10-340, 2010 WL 2696750, at *4 (D. Md. July 6, 2010); *Wimberly v. Empire Fire & Marine Ins. Co.*, 192 F. Supp. 2d 406, 409 n.4 (D. Md. 2002); *Travelers Indem. Co. v. Allied-Signal, Inc.*, 718 F. Supp. 1252, 1253 (D. Md. 1989).

Moreover, if the insurance policy provides that "'it shall not be valid until it is countersigned by an officer or agent of the company, the place of countersigning is held to be the place of the making of the contract,'" because the countersignature is the last act necessary to effectuate the policy.  *Ohio Cas. Ins. Co. v. Ross*, 222 F. Supp. 292, 295 (D. Md. 1963) (citation omitted); *accord Ifco Sys. N. Am., Inc. v. Am. Home Assurance Co.*, No. WMN-09-2874, 2010 WL 1713866, at *2-3 (D. Md. Apr. 27, 2010); *Rouse Co. v. Fed. Ins. Co.*, 991 F. Supp. 460, 464-65 (D. Md. 1998); *Eastern Stainless Corp. v. Am. Protection Ins. Co.*, 829 F. Supp. 797, 799 (D. Md. 1993); *Riviera Beach Vol. Fire Co. v. Fid. & Cas. Co. of N.Y.*, 388 F. Supp. 1114, 1119-20 (D. Md. 1975); *ARTRA Grp., Inc. v. Am. Motorists Ins. Co.*, 100 Md. App. 728, 736, 642 A.2d 896, 900 (1994), *rev'd on other grounds*, 338 Md. 560, 659 A.2d 1295 (1995).

Millennium argues that New Jersey law should apply because the Insurers delivered the Master Policies to Millennium's insurance broker, Marsh, in Morristown, New Jersey.  *See* Millennium Motion at 16.  The Insurers respond that New York law should govern because the Master Policies were both countersigned in New York.  *See* Insurers' Motion at 29-30.

The National Union Policy includes an express countersignature provision.  The policy contains the signatures of officers of National Union and, above their signatures, states: "In

Witness Whereof, this policy has been executed by the President and Secretary of the Company, but this policy shall not be valid unless signed at the time of issuance by an authorized representative of the Insurer on the Declarations page of the policy." National Union Policy at 8. On the last page of the Declarations section, the National Union Policy states that it was "issued at" an address in New York, and contains a signature line labeled "for the company." *Id.* at 16. The signature on the line is that of David S. Oliver, who was then the Vice President, Property, of AIG Global Marine and Energy, and in that capacity was "in charge of the negotiation and issuance" of the National Union Policy. ECF 151-1 at 1. In an affidavit, Mr. Oliver avers that he signed the National Union Policy in New York on June 23, 2008. *Id.* at 2.

The ACE Policy does not contain a provision expressly stating that it shall not be valid unless countersigned. However, the Insurers point out that it, too, contains a signature on its Declarations page, dated July 17, 2008. ACE Policy at 6. The signature line is labeled "Signature of Authorized Agent" and states: "Located at New York City, New York." *Id.*[13]

Millennium endeavors to trace the history of the rule, within the *lex loci contractus* doctrine, that the place of countersigning is the *locus contractus* if a countersignature is required, in an attempt to demonstrate that the signatures that appear on the Master Policies are not true countersignatures, but are merely signatures. *See* Millennium Reply at 4-6 (citing, *inter alia*, *Cromwell v. Royal Canadian Ins. Co.*, 49 Md. 366 (1878)). According to Millennium, the countersignature rule only applies to the countersignature of a local agent of the insurer that authenticates and executes a completed policy that has already been signed, in blank, by an officer of the insurer at its home office. *See* Millennium Motion at 4-6. Millennium

_____

[13] The parties have not identified who signed the Declarations page of the ACE Policy.

acknowledges that several cases, such as *Rouse*, *supra*, 991 F. Supp. 460, and *Eastern Stainless*, *supra*, 829 F. Supp. 797, have applied the countersignature rule in the context of policy language similar to that contained in the National Union Policy, but Millennium insists that these cases have failed to appreciate "the historical rationale for application of the countersignature rule." Millennium Motion at 6 n.7.   Moreover, Millennium suggests that, even if the National Union Policy does require and contain a true countersignature, the Court should reject the "outdated 'countersignature' exception" as "artificial."   *Id.* at 7.

If the Court were required to conduct a *lex loci* analysis, I would hold that New York law governs.   In my view, the National Union Policy's countersignature requirement is indistinguishable from the insurance policy requirements in the many cases, already cited, where the countersignature rule for *lex loci contractus* has been applied as a matter of Maryland law. Even if I were inclined to reject the countersignature rule on policy grounds, the policy choice is not mine to make.   This Court's task, when sitting in diversity, is to apply state law in accordance with "how [the state's highest] court would rule if presented with the issue," *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002), and the Maryland Court of Appeals has given no indication that it intends to abandon the countersignature rule.[14]   The fact that the ACE Policy does not, by its terms, require a

---

[14]   In support of its contention that the countersignature rule should be rejected on policy grounds, Millennium cites *CPC International, Inc. v. Aerojet-General Corp.*, 825 F. Supp. 795, 805 (W.D. Mich. 1993), in which the court observed that "[t]he only certain way for parties to state their reasonable expectations of the substantive law that will apply in such disputes is to negotiate a choice-of-law clause into their contracts."   But, nothing prevented Millennium or the Insurers from inserting a choice of law provision into the Master Policies, if they had so desired. And, application of the law of the state where Millennium's broker received the Master Policies would be no less arbitrary (indeed, it is arguably more so) than application of the law of the place where the Master Policies were countersigned and issued by the Insurers' underwriters.

countersignature to make it binding gives some cause for hesitation as to whether New York law should govern the ACE Policy.  However, the ACE Policy does contain a signature of ACE's agent in New York.  Moreover, it would be strange to interpret the two policies under the law of different states, when the clear intent of the parties was that the Master Policies would be construed together, as part of a unified program of coverage.

Nevertheless, I find it unnecessary to make a definitive choice of law because I am not persuaded that there is any difference between the substantive laws of New York and New Jersey that is meaningful in this case.  "'Choice-of-law analysis becomes necessary . . . only if the relevant laws of the different states lead to different outcomes.'"  *Cleaning Auth., Inc. v. Neubert*, 739 F. Supp. 2d 807, 820 (D. Md. 2010) (citation omitted).

Review of the common law of New York and New Jersey regarding the interpretation of insurance policies reveals little, if any, difference between them.  Both New York and New Jersey require insurance policies to be interpreted according to their plain language.  *Compare Mem'l Props., LLC v. Zurich Am. Ins. Co.*, 46 A.3d 525, 532 (N.J. 2012) ("The terms of insurance contracts are given their 'plain and ordinary meaning' . . . .") *with Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co.*, 945 N.E.2d 1013, 1017 (N.Y. 2011) ("If the plain language of the policy is determinative, we cannot rewrite the agreement by disregarding that language.").

If the policy language is ambiguous, both New York and New Jersey require construction of the policy against the insurer and in accordance with the reasonable expectations of the insured.  *Compare Selective Ins. Co. v. Hudson East Pain Mgmt. Osteopathic Med. & Phys. Therapy, Essex Surg. Ctr., L.L.C.*, 46 A.3d 1272, 1277 (N.J. 2012) ("[C]overage provisions are

to be read broadly, exclusions are to be read narrowly, potential ambiguities must be resolved in favor of the insured, and the policy is to be read in a manner that fulfills the insured's reasonable expectations.") *with Fed. Ins. Co. v. Int'l Bus. Machs. Corp.*, 965 N.E.2d 934, 936 (N.Y. 2012) (stating that, if "there is a 'reasonable basis for a difference of opinion' as to the meaning of the policy . . . the language at issue would be deemed to be ambiguous and thus interpreted in favor of the insured," and that, in "analyzing the meaning of an insurance policy provision, it is necessary to determine the 'reasonable expectations of the average insured'") (citations omitted) *and Metro. Prop. & Cas. Ins. Co. v. Mancuso*, 715 N.E.2d 107, 112 (N.Y. 1999) ("When an insurance carrier drafts an ambiguously worded provision and attempts to limit its liability by relying on it, we will construe the language against the carrier."). And, both New York and New Jersey permit a court to consider extrinsic evidence to resolve ambiguities in the meaning of policy language. *Compare State v. Home Indem. Co.*, 486 N.E.2d 827, 829 (N.Y. 1985) ("If . . . the language in the insurance contract is ambiguous and susceptible of two reasonable interpretations, the parties may submit extrinsic evidence as an aid in construction . . . .") *with Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008) ("If the terms of the contract are susceptible to at least two reasonable alternative interpretations, an ambiguity exists. In that case, a court may look to extrinsic evidence as an aid to interpretation.") (internal citation omitted).

To the extent that there is any difference between New York and New Jersey law in this connection, it appears to be one of degree and subtle emphasis rather than a stark distinction of principle. The case law suggests that New Jersey courts might be more inclined, on the margins, to reject an insurer's proffer of extrinsic evidence for the purpose of resolving ambiguity, instead

preferring to construe an ambiguous policy against the insurer who drafted it, as a matter of law. New York courts apply this principle of construction against the drafter, also known as "*contra proferentem*," only if there is no extrinsic evidence that sheds light on the question or "if the tendered extrinsic evidence is itself conclusory and will not resolve the equivocality of the language of the contract." *State v. Home Indem. Co.*, *supra*, 486 N.E.2d at 829. However, New Jersey courts also recognize an exception to the "*contra proferentem*" rule in cases where the insured is a "sophisticated commercial entit[y] that do[es] not suffer from the same inadequacies as the ordinary unschooled policyholder and [has] participated in the drafting of the insurance contract." *Benjamin Moore & Co. v. Aetna Cas. & Sur. Co.*, 843 A.2d 1094, 1103 (N.J. 2004). In any event, I am convinced that I would reach the same ruling in this case under either New York or New Jersey law.

## C.  Coverage

The coverage question in this case is a difficult one. The complexities of the Western Australian natural gas market defy easy description, there is little case law on point, and Endorsement 8 of the Master Policies is not a model of clarity.

### *1.  Contentions*

There is much that could be debated about the interpretation of Endorsement 8 of the Master Policies but, to their credit, the parties have narrowed the issues in dispute. For instance, based on the language of Endorsement 8, one could argue that it provides coverage for damage only at particular designated locations that are specially defined as "CONTRIBUTING PROPERTY(IES)." Section "C" of the endorsement, titled "Coverage," states that Endorsement 8 provides coverage "only" for business interruption losses "caused by damage to or destruction

of *any of the real or personal property described above* and referred to as CONTRIBUTING

PROPERTY(IES)."  ACE Policy at 48 (emphasis added).  However, no contributing properties

are actually listed or described "above" in the "Schedule of Location(s)" in either of the Master

Policies.  Nevertheless, the parties agree that Endorsement 8 provides coverage for unlisted

contributing properties (so long as they meet other requirements for coverage) because the

Declarations of the Master Policies provide for $10 million per occurrence in CBI coverage for

"unnamed" properties.[15]

Similarly, one could argue that Endorsement 8 requires that only specifically named (as

opposed to unnamed) contributing properties are subject to the requirement that they be "direct"

contributing properties.  The "Coverage" language in Section "C" of Endorsement 8 does not

apply the adjective "direct" to the phrase "CONTRIBUTING PROPERTY(IES)."  Although the

parties talk past each other to a degree in briefing this issue, it appears that both sides agree that

CBI coverage under the Master Policies applies only to "direct contributing properties," whether

named or unnamed, because the Declarations refer to coverage for both named and unnamed

"*direct* contributing or recipient property(ies)."   ACE Policy at 14 (emphasis added;

capitalization altered).  *See* Millennium Motion at 21 ("[T]he most obvious and reasonable

interpretation of [Endorsement 8], read together with the Declarations Page, is that Millennium

purchased a minimum of $10,000,000 in insurance coverage for economic loss resulting from

damage to property of any direct unnamed contributing properties . . . ."); Insurers' Motion at 35

---

[15] Indeed, the parties appear to agree that the higher $25 million sublimit of CBI coverage for "named" contributing properties could never apply, because no specific contributing properties were identified in Endorsement 8.

n.6 ("[I]t is clear from the Declarations that coverage for both named and unnamed contributing properties is limited to 'direct' . . . contributing properties.").[16]

Notably, the parties disagree about the meaning of "direct contributing property," and whether Apache was a "direct contributing property" to Millennium.  Part of their debate concerns whether the limitation stated in Section "B" of Endorsement 8—*i.e.*, the limitation that the "following locations must be *direct suppliers of materials to the Insured's locations* or coverage is deemed to be void"—applies to unnamed contributing properties.  ACE Policy at 48 (emphasis added).   This limitation is not contained in Section "C," which delineates the "Coverage" under the endorsement, and is where one might expect a limitation on coverage to be found.  Rather, it appears in Section "B," the part of the endorsement devoted to listing particular locations that are "CONTRIBUTING PROPERTY(IES)."   Millennium contends that, because this limitation only applies, by its terms, to the "following locations," the limitation applies only to named contributing properties (for which there would have been a higher sublimit of insurance, if any had been named) and not to unnamed contributing properties.  *See* Millennium Motion at 21. Thus, as Millennium sees it, a "contributing property" need not necessarily be a "supplier."   In contrast, the Insurers argue that "contributing property" and "supplier" are essentially synonymous, and that the limitation that a contributing property must be a "direct supplier of materials to the Insured's locations" applies to both named and unnamed contributing properties.  *See* Insurers' Motion at 36-37; Insurers' Reply at 2-3.

---

[16] I note that the parties agree that Endorsement 8 applies to "direct contributing properties" despite the fact that the phrase "direct contributing properties" appears only in the Declarations and is not contained anywhere in the text of Endorsement 8 itself.

The Master Policies do not define the phrases "direct supplier" or "contributing property," or any of their component words. The parties agree that these words and phrases have no particular technical meaning in the insurance context, and must be interpreted according to their plain meaning. Although both sides argue that the meaning of these words is unambiguous, they vigorously disagree as to their meaning in the context of the Master Policies.[17]

According to the Insurers, Apache's Varanus Island facility was not a direct contributing property to Millennium's business, because Millennium had no "direct relationship" with Apache. Rather, as the Insurers see it, Alinta was Millennium's "direct supplier" of gas and, hence, the only direct contributing property. In this regard, the Insurers point out that Millennium had a contract for the supply of natural gas with Alinta, and had no such contract with Apache. However, the Insurers disclaim reliance on a contractual relationship with the insured, as such, as the *sine qua non* of a direct contributing property.[18] Instead, they maintain that, for a contributing property to be "direct," it must have a "direct relationship" with the insured, which might or might not be contractual. *See* Insurers' Motion at 45-46.

Although Millennium contends that an unnamed direct contributing property does not necessarily need to be a "direct supplier," Millennium also argues that Apache was a direct supplier of natural gas to Millennium, despite the intervention of Alinta. This is so because, as

---

[17] The parties devote substantial discussion to the meaning of the term "contributing properties," but the structure of Endorsement 8 is such that it is unclear whether the term was intended to have any independent substantive meaning at all. Rather, it is at least arguable that the term "CONTRIBUTING PROPERTY(IES)" was merely intended as a shorthand label for the properties identified in the "schedule of location(s)" in Section "B" of the endorsement.

[18] Notably, other coverage provisions of the Master Policies expressly require a contractual relationship between the insured and a third party as a condition of coverage, indicating that, if the Insurers wished to limit coverage on the basis of contractual privity, they knew how to do so explicitly.

Millennium's expert Mark Chatfield contends, Alinta does not actually "supply" natural gas.  In Mr. Chatfield's words, Alinta "is not a gas producer, nor is it a gas transporter.  It is simply an aggregator and reseller. . . .   It is not a producer of gas because it has no gas production facilities."  Chatfield Report at 3-4.  Mr. Chatfield explains, *id.* at 3:

> [A] gas trader [such as Alinta] can build a profitable business in the [Western Australia] gas chain by purchasing gas in large quantities at a price that is lower than would be achieved by each of its end users purchasing a small quantity itself, by relieving the end users of the time and expense of booking and managing transport capacity in the DBNGP . . . , by aggregating the end user demand such that it can use their diversity and non coincident peak demand to require less firm transport capacity in the DBNGP . . . than they would require individually, and by applying its balance sheet and credit worthiness to the gas purchase and gas transport arrangements such that the suppliers of gas and transport recognise less risk in the transaction than if they dealt with the individual end users.

To illustrate his argument, Mr. Chatfield poses a hypothetical, *id.* at 4:

> Consider the situation that would have existed if hypothetically Millennium had purchased gas pursuant to a gas supply agreement with . . . Apache, rather than through Alinta Sales.  In this situation, . . . Apache . . . would have issued a force majeure notice after the Varanus Island incident directly to Millennium, requiring it to cease the consumption of gas.  In each case, the Varanus Island incident would have caused damage to a direct supplier of gas to Millennium.

> In effect, nothing changes with the imposition of a gas trader, Alinta Sales, between Millennium and . . . Apache . . . .   There is still a direct dependence by Millennium on gas supply from . . . Apache . . . .   The presence of Alinta Sales in the arrangement is simply a commercial arrangement designed to capture economic rent through aggregation of demand and the consequent redistribution of purchasing power.  It does not insert another direct supplier of material between the gas producers and Millennium, it inserts a contracting mechanism.

Furthermore, Millennium argues that, even if Apache was not a direct supplier to the Bunbury Operations, the Master Policies still provide CBI coverage, because Endorsement 8 states that the policies cover business interruption losses caused by damage to a contributing property that "wholly or partially prevents the delivery of materials to the Insured *or to others for*

*the account of the Insured . . . .*"   ACE Policy at 48 (emphasis added).   Millennium maintains

that, even if the Varanus Island explosion did not prevent the delivery of gas directly to

Millennium, the explosion prevented the delivery of gas to Alinta for Millennium's account.

The Insurers contend that Millennium has incorrectly construed the "for the account of"

clause in the endorsement.   It claims that, in order for the "for the account of" clause to apply,

there still must be a direct contributing property and, as the Insurers see it, Apache is not a direct

contributing property to Millennium, because it is not a direct supplier.   Moreover, the Insurers

argue that the "for the account of" clause is intended to apply to a different type of factual

scenario than that presented by the relationships among Apache, Alinta, and Millennium.

### 2.   Case Law

As noted, there is relatively little case law addressing CBI coverage.   To my knowledge,

there are only three cases that shed significant light on the issues presented here.   They include

the first reported decision in which contingent business interruption insurance was discussed,

*Archer-Daniels-Midland Co. v. Phoenix Assurance Co.*, 936 F. Supp. 534 (S.D. Ill. 1996)

("*ADM*"); the Eighth Circuit's decision in *Pentair*, *supra*, 400 F.3d 613; and a recent unreported

district court decision, *Park Electrochemical Corp. v. Continental Casualty Co.*, No. 04-CV-

4916 (ENV)(ARL), 2011 WL 703945 (E.D.N.Y. Feb. 18, 2011).

*ADM* concerned losses from the Mississippi River's "unprecedented flooding" in the

Summer of 1993, which affected 20 million acres of farmland in nine Midwestern states, causing

$6.5 billion in crop damage.   936 F. Supp. at 536.   The global agribusiness company ADM

sustained over $50 million in losses due to the flooding, and sought to recover under its CBI

coverage.   *Id.*   Its CBI policies covered business interruption losses "caused by damage to or

destruction of real or personal property . . . of *any supplier of goods or services* which results in the inability of such supplier to supply an insured locations [sic]." *Id.* at 540 (quoting policies) (emphasis added).

ADM contended that the farmers throughout the Midwest who grew the crops that ADM processed were "supplier[s] of goods or services" under the policies. *See id.* at 543. In contrast, ADM's insurers contended that "the farmers are not suppliers because ADM does not contract for the purchase of grain from individual farmers. Rather, ADM purchases grain from licensed grain dealers," who in turn "either purchased the grain directly from farmers or from other dealers." *Id.* at 543-44. The court agreed with ADM's application of the policy language.

Neither side contended, and the court did not find, that the language of the policies was ambiguous. *Id.* at 540. The court reasoned that the "key phrase for present purposes is 'any supplier of goods or services,'" and that under the "plain, ordinary, and popular meaning" of that phrase, derived from dictionary definitions of "any," "supply," and "supplier," the phrase "denotes an unrestricted group of those who furnish what is needed or desired." *Id.* at 541. Applying that construction of the policy language, the *ADM* Court observed that the policies did "not state that coverage is limited to principal suppliers or suppliers with whom ADM has a written contract, rather, they apply to 'any' supplier." *Id.* at 543. Thus, it reasoned that "the policy language does not limit coverage to those suppliers in direct contractual privity." *Id.* at 544. Moreover, the court rejected the insurers' argument that ADM's interpretation meant that the policies' coverage was essentially limitless, such that ADM could claim that its "business was interrupted because of damage to a supplier of the farmers." *Id.* It said, *id.*:

> The goods at issue is the grain grown by the Midwest farmers. The grain is produced by the farmers and sold to grain dealers, who then sell it to ADM. The

farmers may be an 'indirect' supplier of the grain, but they are a supplier nonetheless.  Had either of the parties wanted to limit the coverage to 'direct' suppliers, they could easily have added language to that effect.

In *Pentair*, 400 F.3d at 614, the Eighth Circuit described the facts giving rise to a CBI coverage claim:

> An earthquake struck Taiwan in September 1999, disabling a substation that provided electric power to two Taiwanese factories.  Lacking power, the factories could not manufacture products they were supplying to a subsidiary of Pentair, Inc.  When production resumed two weeks later, Pentair shipped orders from Taiwan via airfreight to meet its customers' needs for the Christmas season, resulting in additional costs . . . .

Pentair sought to recover its additional shipping costs under its CBI policy, which insured against "losses incurred by Pentair as the result of 'damage' to 'property of a supplier of goods and/or services to the Insured' that is caused by a covered peril, here, an earthquake."  *Id.* at 614-15 (quoting policy).  Relying on *ADM*, Pentair argued that the Taiwanese power substation was one of Pentair's "suppliers" within the meaning of the policy.  *See id.* at 615.

The Eighth Circuit held that the "power substation was not 'a supplier of goods and/or services' *to Pentair* within the plain meaning" of the policy.  *Id.* (emphasis in original).  Rejecting the analogy between the power substation and the farmers in *ADM* as "inapt," *id*, the court reasoned, *id.*:

> In [*ADM*], each farmer supplied a product (grain) that a dealer then resold to the insured, ADM. . . .  Here, on the other hand, though the substation supplied power to the Taiwanese factories, the Taiwanese power company did not supply a product or service ultimately used by Pentair.  Thus, it was not a Pentair supplier for purposes of [the policy] because it supplied no goods or services to Pentair, directly or indirectly.

The recent decision in *Park Electrochemical* concerned two companies, Nelco and Neltec, both of which were wholly-owned subsidiaries of their parent, Park.  2011 WL 703945,

at *1.  Among "other lines of business," Park developed and manufactured "printed circuit boards and other advanced materials for the telecommunications, computing, and aerospace industries." *Id.*  The court explained the facts that gave rise to the CBI coverage dispute, *id.*:

> Neltec, based in Tempe, Arizona, manufactures and sells a product called N6000. Neltec purchases its entire supply of "prepreg," a vital component of N6000, from Nelco, located in Singapore.  On November 27, 2002, an explosion at Nelco's Singapore facility destroyed the special "treater" used to produce prepreg, temporarily halting Nelco's ability to supply prepreg to Neltec and, per force, Neltec's ability to produce N6000.  According to [Park and Neltec], Neltec's N6000 customers could not readily substitute any alternative Neltec product, causing Neltec to lose a significant amount of income.

Park and Neltec were insured under a CBI policy, which covered business interruption losses "caused by direct physical damage or destruction to . . . any real or personal property of *direct suppliers* which wholly or partially prevents the delivery of materials to the Insured or to others for the account of the Insured." *Id.* at *2 (emphasis added).[19]  The insurer maintained that the CBI coverage did not apply, because "subsidiaries of the insured, such as Nelco, are not considered 'direct suppliers' under the policy." *Id.*

The court noted that the "term 'direct suppliers' is not defined anywhere in the policy," and concluded that the "language of the policy on this point is vague and ambiguous." *Id.* at *4. As the court saw it, both sides provided "reasonable interpretations of the term: it could be read to include any supplier, regardless of whether the supplier is a subsidiary of the insured, or it could be read to exclude subsidiaries or sister companies of the insured." *Id.*  Accordingly, the court looked to extrinsic evidence.  It considered insurance industry practices, reflected in policies discussed in other cases as well as treatises and articles concerning CBI coverage,

---

[19] Nelco was not insured under the CBI policy.  Nelco was insured under a separate property insurance policy which provided coverage for Nelco's losses in connection with the explosion.  However, Nelco's policy "did not cover any of Neltec's lost income." *Id.* at *1.

stating that CBI coverage was "limited to loss caused by damage to entities not owned by the insured." *Id.* at *5. However, the court pointed out that the policies in the other cases had expressly limited CBI coverage in that manner, using "policy language . . . far more clear and explicit than the language [the insurer] chose to include in the policy here." *Id.* Similarly, the treatises spoke in terms of "explicit policy provisions that putative drafters should use." *Id.* at *5 n.6. The court observed that, if the insurer had "followed [the treatises'] advice and explicitly listed what 'direct suppliers' would be covered under the CBI Provisions, this dispute would have been avoided." *Id.*

The court also rejected the insurer's reliance on a "Claims Preparation Manual," prepared by Park's insurance broker, which stated that, under a CBI coverage claim, "'the supplier/receiver cannot be owned [sic] or a subsidiary of the insured party.'" *Id.* at *6 (quoting manual). The court said: "[W]hile the manual provides evidence of standard practice in the insurance industry, it is, at the same time, not probative of the intent of the parties at the time they entered into the contract, since the manual was not provided to Park until after the Singapore incident." *Id.*

After reviewing deposition testimony of various persons involved in negotiation of the policy, the *Park Electrochemical* Court concluded that the "ambiguity survives the proffers of extrinsic evidence," and that the question of whether subsidiaries could be "direct suppliers" under the policy would need to be resolved by a jury. *Id.* As the court saw it, where the "'extrinsic evidence is available but inconclusive,'" and the "available evidence 'presents a choice among reasonable inferences,'" resolution of the ambiguity in favor of the insured as a matter of law was inappropriate. *Id.* (citations omitted).

### 3. Direct Contributing Property

Assuming, *arguendo*, that the "direct supplier" language in Section "B" of Endorsement 8 applies to unnamed contributing properties, it is clear that Apache was a "supplier" of natural gas to Millennium, in much the same way as the farmers were suppliers of grain to ADM.  This case is unlike *Pentair*, where the electrical substation was a supplier of electrical power to the Taiwanese factories, which in turn supplied something else—the factories' manufactured goods—to the insured, Pentair.  Here, the product that Apache supplied, natural gas, was the "product or service ultimately used by" Millennium as the insured, *Pentair*, 400 F.3d at 615, just as in *ADM*, the "goods at issue [were] the grain grown by the Midwest farmers."  *ADM*, 936 F. Supp. at 544.

The CBI policy in *ADM* contained no provision limiting coverage to "direct" suppliers, however, which made a significant difference in the *ADM* Court's analysis and, according to the Insurers, should make a dispositive difference here.  Because the farmers did not sell grain directly to ADM, but instead sold the grain to dealers who in turn sold to ADM, the *ADM* Court reasoned that the farmers were "indirect" suppliers.  But, the court observed that there was no basis in the text of ADM's insurance policy to conclude that that an indirect supplier would not be covered.  Unlike in *ADM*, the parties here agree that coverage is contractually limited to "direct" contributing properties.  The Insurers argue that, if Apache is like the farmers in *ADM*, then Alinta is in much the same position as the grain dealers.  Because the Master Policies here, unlike the policies at issue in *ADM*, limit coverage to "direct" contributing properties, the Insurers contend there is no coverage.  However, as the court in *Park Electrochemical* recognized, the word "direct" and the phrase "direct supplier" are not necessarily self-defining.

To be sure, Millennium contracted directly with Alinta for natural gas, and had no contract with Apache.  If the Master Policies provided that a direct contractual relationship with the insured were the only connection that could establish an entity as a direct contributing property, I would agree with the Insurers.  But, as the Insurers concede, Endorsement 8 does not require an entity to be in contractual privity with the insured in order to be a direct contributing property.  And, if the Insurers intended to make contractual privity a requirement, they knew how to draft policy language to that effect.  Indeed, in another endorsement of the Master Policies, the Insurers specifically limited coverage to damage to "Off-Premises property . . . owned by and *with whom the Insured has contracted* to furnish power to the premises insured." ACE Policy at 73 (emphasis added).

The Insurers argue that, if there is no contractual relationship, some other "direct relationship" between Apache and Millennium would be necessary for Apache to be a direct contributing property to Millennium.  But, the Insurers are unable to explain what they mean by the phrase "direct relationship," aside from a contractual relationship.  Moreover, the phrase "direct relationship" does not appear in Endorsement 8.

It is noteworthy that Endorsement 8 does not speak in terms of the relationships among people and entities.  Rather, it speaks in terms of the relationships between physical properties. Section "C" of the endorsement provides coverage for loss "caused by damage to or destruction of . . . *real or personal property* . . . which is not operated by the Insured, . . . which wholly or partially prevents the delivery of materials to the Insured or to others for the account of the Insured and results directly in a necessary interruption of the Insured's business."  ACE Policy at 48 (emphasis added).  The limitation in Section "B," upon which the Insurers rely, limits

coverage to "*locations* [that are] direct suppliers of materials *to the Insured's locations*."   *Id.* (emphasis added).   And, of course, the entire endorsement is phrased in terms of "CONTRIBUTING *PROPERTY*(*IES*)."   *Id.* (emphasis added).   This suggests that the physical relationship between the properties is as or more important than the legal relationship between the properties' owners.

Although Apache and Millennium both contract with Alinta, rather than with each other, the contracts with Alinta have no effect on the physical realities of natural gas supply between Varanus Island and the Bunbury Operations.   Regardless of whether Millennium contracted with Alinta or contracted directly with Apache, the pressurized natural gas still would flow directly from Apache's facility through the DBNGP to Millennium's Bunbury Operations by operation of, in Mr. Chatfield's words, the "law of physics."   Although Alinta has legal title to the gas while it is in the 1,500-kilometer Dampier-to-Bunbury Natural Gas Pipeline, Alinta never takes physical possession of the gas and has no "property" with which to do so.

Arguably, those facts render this case distinguishable from the situation in *ADM*, where the CBI policy insured against damage caused by "'destruction of real or personal property . . . *of any supplier* of goods or services.'"   *ADM*, 936 F. Supp. at 540 (quoting policy) (emphasis added).   A "supplier" under the *ADM* policy was an owner of property, not a property itself. Moreover, although the opinion in *ADM* does not discuss the mechanics of grain distribution, it is likely that the grain dealers, who purchased grain from the farmers and then sold it to ADM, took physical possession of the grain from the farmers.   In contrast, the gas produced by Apache flows from Apache's facility into the DBNGP, where it is commingled with gas from other producers, and flows out of the DBNGP at outlet points, including the outlet points at the

- 32 -

Bunbury Operations.  Alinta does not store or transport the gas; it merely buys and sells it.  If the grain dealers in *ADM* had performed a purely economic task of supply-and-demand aggregation, such as Alinta did here, such that ADM received its grain from the farmers via a physical mechanism of grain transportation akin to the Dampier-to-Bunbury pipeline, or (more plausibly) such that, although ADM paid the purchase money for the grain to a middleman, the grain was trucked to ADM directly from the farmers' silos, it is doubtful whether the *ADM* Court would have described the farmers as "indirect" suppliers to ADM.

All of this is not to say that Endorsement 8 unambiguously supports Millennium's position.  Millennium did not contract directly with Apache for the supply of natural gas, nor was its contract with Alinta merely an agency contract, in which Alinta acted as Millennium's or Apache's representative.  Although Millennium was one step removed from Apache, this did not alter the physical mechanism for distribution of gas.  But, it goes without saying that the ways in which parties structure their contractual relationships can have real-world consequences.

The contract expressly called for Alinta to "supply" Millennium with natural gas.  David Oliver, National Union's underwriter with AIG, testified in his deposition that the reason National Union typically did not provide "indirect" CBI coverage was that, in that circumstance, National Union viewed the insured as "once removed from being able to control the situation in the case of a potential issue."  Ex.68 to Insurers' Motion at 391 (ECF 151-54).  He explained, *id.* at 391-92:

> [I]f you [as the insured] have a direct relationship with your supplier and you contract with them or however it is that you deal with them and they're supplying you goods and they have a problem, . . . you have some clout over them, control over them to . . . encourage their due diligence in getting themselves back into operation any way they can to be able to supply you.

You . . . don't get that with an indirect because now you're once removed. Now the supplier has got to deal with his supplier . . . or her supplier and . . . you don't have that control.  You lose control because you're too far removed from it.

It is not an unreasonable interpretation of the Master Policies to conclude that, by providing only "direct" CBI coverage, the Insurers sought to limit their exposure to situations in which the insured lacked the kind of influence over a contributing property that comes with contractual privity.  But, the Master Policies do not say this expressly.

In particular, the policies do not define the term "direct," and what the Insurers understand by that term is not its only possible or reasonable connotation.   Millennium's interpretation, as applied to the factual circumstances surrounding Millennium's natural gas supply, is also a reasonable interpretation of the language that is actually included in the policies. Just as in *Park Electrochemical*, where the phrase "direct supplier" was ambiguous in the context of a supplier that was a subsidiary or corporate affiliate of the insured, the term "direct" is ambiguous here, in the context of an entity that provides a direct physical supply of material to the insured, but has no direct contractual relationship with the insured.  The plain language of the Master Policies cannot resolve this ambiguity.

The *Park Electrochemical* Court, applying New York law, held that, where "the 'extrinsic evidence is available but inconclusive,' and the available evidence 'presents a choice among reasonable inferences,' application of the contra proferentem rule is not appropriate on summary judgment."  2011 WL 703945, at *6.  Accordingly, the court held that the ambiguity in the policy before it would need to be resolved by the finder of fact.  *See id.*

In this case, however, although the parties have presented a virtual cornucopia of extrinsic evidence, none of it presents a dispute of material fact for a fact finder to resolve,

because none of the extrinsic evidence sheds light on what the parties' mutual intent was at the time that the Master Policies were established.  To be sure, if the parties did not already agree that a contributing property must be "direct" in order for coverage to apply, the extrinsic evidence would conclusively resolve the disagreement.  It is plain from the evidence regarding the wording of prior years' policies, and the process of procuring the Master Policies for the 2008–2009 year, that the parties intended that CBI coverage would apply only to "direct" contributing properties.  However, none of the extrinsic evidence speaks to the specific meaning the parties intended by the use of the word "direct," or how they intended it to apply in the context of Millennium's natural gas supply or any similar scenario.  Some evidence, such as Mr. Oliver's testimony, quoted *supra*, is suggestive of what the Insurers may have thought the term "direct" meant.  But, there is no evidence at all to indicate that the Insurers' interpretation was ever communicated to Millennium during the negotiation of the policies, before the explosion on Varanus Island.

Extrinsic evidence is only admissible in matters of contract interpretation if it provides "evidence of the parties' intent" in drafting a contractual provision that is ambiguous by its terms.  *Van Kipnis v. Van Kipnis*, 900 N.E.2d 977, 980 (N.Y. 2008); *see also Conway v. 287 Corporate Ctr. Assocs.*, 901 A.2d 341, 347 (N.J. 2006) ("[W]e permit a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties.").  A court's "'function in construing . . . policies of insurance, as with any other contract, is to search broadly for the probable common intent of the parties . . . .'" *French v. N.J. Sch. Bd. Ass'n Ins. Grp.*, 694 A.2d 1008, 1016 (N.J. 1997); *see also Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500 (N.Y. 2006) ("A basic precept of contract interpretation is that agreements should be

construed to effectuate the parties' intent."). None of the extrinsic evidence submitted by the parties would assist a fact finder in determining the meaning that the parties intended by use of the term "direct," as applied to the factual scenario in this case.

Where ambiguity in an insurance policy cannot be resolved by consideration of extrinsic evidence, the laws of both New York and New Jersey provide a tiebreaker: they apply the doctrine of *contra proferentem*, by which the ambiguity must be resolved in favor of the insured and against the insurer who drafted the policy. Applying the doctrine of *contra proferentem*, I conclude that Apache's natural gas production facility was a "direct contributing property" to Millennium's Bunbury Operations, so as to come within the CBI coverage of the Master Policies, because Apache's facility physically provided a direct supply of natural gas to Millennium's premises, despite the fact that Apache and Millennium had no direct contractual relationship.

### 4. For the Account of the Insured

As noted, Endorsement 8 insures against business interruption losses "caused by damage to or destruction of . . . CONTRIBUTING PROPERTY(IES) . . . which wholly or partially prevents the delivery of materials to the Insured *or to others for the account of the Insured* . . . ." ACE Policy at 48 (emphasis added). Even if the requirement that a contributing property be "direct" were not ambiguous standing alone, the provision of Endorsement 8 regarding "delivery of materials to the Insured *or to others for the account of the Insured*," *id.* (emphasis added), creates a further ambiguity in the Master Policies that cannot be resolved except by application of the doctrine of *contra proferentem*.

Millennium argues that, even if Apache was not a direct contributing property to Millennium, Apache was a direct contributing property to Alinta for Millennium's account, and thus comes within the CBI coverage. The Insurers disagree. Neither side has cited any applicable case law in support of its position regarding the "for the account of" clause.[20]

There are two prongs to the Insurer's argument. First, they insist that, in order for the "account of the Insured" condition to apply, a given property must first be a direct contributing property. If a property is not a direct contributing property, the question of whether it delivers materials "to others for the account of the Insured" does not arise. Because Apache was not a direct contributing property, in the Insurers' view, there is no need for further analysis of whether Apache delivered materials "to others for the account of" Millennium.

The second prong of the Insurers' argument is that the "for the account of" clause simply does not apply to the factual situation presented by Apache, Alinta, and Millennium. The Insurers posit a hypothetical scenario to which they believe the "for the account of" clause would apply, Insurers' Reply at 10:

> If an insured purchases raw cotton from Company A and asks Company A to send the cotton to a warehouse, rather than to the insured's own facility, then Company A would be the insured's direct supplier and the warehouse is the "other" to

_____

[20] The policies at issue in two of the cases concerning CBI coverage have included an identical clause regarding delivery of materials "to others for the account of the Insured." *See Park Electrochemical, supra*, 2011 WL 703945, at *2; *CII Carbon, supra*, 918 So.2d at 1064. However, neither of these cases concerned the meaning of the clause.

In a footnote, Millennium cites a Supreme Court case interpreting a provision of the Internal Revenue Code regarding tax treatment of "damages received . . . on account of personal injuries or sickness," in which the Court stated that "the phrase 'on account of' does not unambiguously define itself," but adopted the government's interpretation of the phrase, which was consistent with its "dictionary meaning" of "'for the sake of: by reason of: because of.'" *O'Gilvie v. United States*, 519 U.S. 79, 82-83 (1996) (quoting dictionary). While the *O'Gilvie* Court's analysis is instructive, the context of *O'Gilvie* is so different from the context of this case that I cannot conclude that *O'Gilvie* is dispositive.

whom the cotton is delivered for the account of the insured.  In that scenario the insured is not purchasing the cotton from the warehouse.  If Company A sustains loss or damage and such loss or damage prevents delivery of the cotton to the warehouse, CBI coverage may be triggered under Endorsement 8.

As to the first prong of the Insurers' argument, as already discussed, I reject their claim that Apache unambiguously is not a direct contributing property to Millennium.  But, even if I did not, the Insurers' argument is circular.  The Insurers insist that, in order to be a direct contributing property, a property must satisfy the condition stated in Section "B" of Endorsement 8: it must be a "direct supplier *to the Insured's locations*."  ACE Policy at 48 (emphasis added).  Unless that condition is satisfied, they claim, the "for the account of" clause is irrelevant.  But, if a contributing property is a "direct supplier to the Insured's locations," it clearly does not deliver materials "to others for the account of the Insured"—it delivers them to the insured.  Thus, the first prong of the Insurers' argument would render Endorsement 8 incoherent and self-contradicting.

To elaborate, under the Insurers' interpretation, the "for the account of" clause could never apply to any contributing property.  This violates the general canon of interpretation, applicable to interpretation of insurance policies as to any other contract, that a court should construe a policy "in a manner that gives full force and effect to the policy language and does not render a portion of the provision meaningless." *Cragg v. Allstate Indem. Corp.*, 950 N.E.2d 500, 502 (N.Y. 2011); *see also Porreca v. City of Millville*, 16 A.3d 1057, 1070 (N.J. Super. Ct. App. Div. 2011) ("A contract 'should not be interpreted to render one of its terms meaningless.'") (citation omitted).

In the second prong of their argument, the Insurers posit that the "for the account of" phrase could refer to a situation where a supplier and an insured have a contract for the supply of

goods, but the insured directs the supplier to deliver the goods to others for its account—*i.e.*, the insured's account with the supplier.  The Insurers do not explain, however, how Company A in its hypothetical would qualify as a "direct supplier *to the Insured's locations*," ACE Policy at 48 (emphasis added), which the Insurers maintain is an essential feature of a direct contributing property.  Moreover, the Insurers do not explain why the meaning of the "for the account of" clause is limited to the situation in their hypothetical—in other words, why the "for the account of" clause could not cover both a situation like the Insurers describe and the situation that actually arose in this case.  Here, the supplier, Apache, delivered gas to "others" (*i.e.*, Alinta) for the account of the insured—*i.e.*, Millennium's account with Alinta.

The phrase "delivery of materials . . . to others for the account of the Insured" is ambiguous.  The ambiguity lies in who must hold the "account of the Insured"—the one who delivers, or the "others" to whom delivery is made.  Or, whether it can be both, or either one.  The text of the policy does not resolve the issue.  Moreover, the parties have not presented any extrinsic evidence bearing on the meaning of the phrase.  Indeed, Paul Lafferty, the senior adjuster with AIG who authored National Union's initial denial of Millennium's claim, admitted in his deposition that he was "not sure" of the meaning of the "for the account of" clause.  Ex.55 to Insurers' Motion at 107 (ECF 151-43).  In the absence of any extrinsic evidence that could resolve the ambiguity, both New York and New Jersey law dictate application of the principle of *contra proferentem* and construction of the phrase in favor of coverage for the insured.

In sum, I conclude that the text of Endorsement 8 is ambiguous as to whether it provides CBI coverage to Millennium under the circumstances at issue.  Because there is no extrinsic evidence that is capable of resolving the issue either way, there is no dispute of material fact for

a fact finder to resolve and, as a matter of law, the Master Policies must be construed under the doctrine of *contra proferentem*, in favor of Millennium, the insured.

### D.  Good Faith

The Insurers have moved for summary judgment as to Count III of Millennium's complaint, which asserts a cause of action under a Maryland statute, C.J. § 3-1701, for failure to act in good faith in denying insurance coverage.[21]   They maintain that C.J. § 3-1701 does not apply because this case is not governed by Maryland substantive law.  But, even if C.J. § 3-1701 does apply, the Insurers contend they are entitled to summary judgment because there is no evidence that they denied Millennium's claim in bad faith.

Millennium argues that the Maryland statute applies because the Insurers "dealt with Millennium's offices in Hunt Valley, Maryland," and "were keenly aware of the fact that they were dealing with the insureds in Maryland."  Millennium Reply at 30.  Moreover, even if New York or New Jersey law governs, Millennium contends that both states "allow for the award of expanded damages where an insurer acts in bad faith."   *Id.* at 30 n.19 (citing *Bi-Economy Market, Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127 (N.Y. 2008), and *Pickett v. Lloyd's*, 621 A.2d 445, 451 (N.J. 1993)).

On the merits, Millennium argues that the Insurers have demonstrated bad faith because they "made an initial determination very early on to deny the claim, . . . based solely upon the fact that there was no contract between Millennium and Apache."  Millennium Reply at 31-32.  Moreover, "despite putting on an outward façade giving the appearance that they would consider Millennium's arguments, the Insurers refused to reconsider their initial position no matter what

---

[21] Some states recognize claims for bad faith denial of coverage, but Maryland's statute is phrased in terms of failure to act in good faith.  *See* C.J. § 3-1701(d)(2).

Millennium did." *Id.* at 32.   As Millennium sees it, the Insurers' witnesses "have shown throughout this litigation that they do not understand how their own policies work," and thus "their decision could not have been informed, based on honesty and diligence, and supported by the evidence." *Id.*

Because this case is governed by either New York or New Jersey law, but not by Maryland law, Maryland's good faith statute does not apply here.   Judge Blake's ruling in *Fogarty v. Allstate Ins. Co.*, Civ. No. CCB-04-414, 2011 WL 1230350, at *7 (D. Md. Mar. 30, 2011), is instructive:

> [I]t appears that under Maryland's choice of law rules, Kentucky law, not Maryland law, governs Fogarty's bad faith claim. Although the plaintiff has not cited, and the court has not found, a Maryland state court case addressing the issue, judges of this court have repeatedly held that under Maryland's choice of law rules, the law that governs a bad faith claim is the same law that governs the insurance contract from which the claim of bad faith arises.

Nevertheless, even if Maryland's statute did apply, or under the bad faith standard of New York or New Jersey, Millennium's claim fails on the merits.   In the first reported decision construing Maryland's good faith law (which was enacted relatively recently, in 2007), *Cecelia Schwaber Trust Two v. Hartford Accident and Indemnity Co.*, 636 F. Supp. 2d 481 (D. Md. 2009), Judge J. Frederick Motz of this court considered the substantive standard that should apply to claims under the Maryland statute. Maryland's statute regarding denial of coverage without good faith "applies only to first-party claims under property and casualty insurance policies." C.J. § 3-1701(b).[22]   It requires an insurer to make "an informed judgment based on

---

[22] A claim under C.J. § 3-1701 is ordinarily subject to an administrative exhaustion requirement with the Maryland Insurance Administration.  *See* C.J. § 3-1701(c)(1); *see also* Md. Code (2011 Repl. Vol.), § 27-1001(c)-(g) of the Insurance Article.   However, there is an exception to the exhaustion requirement for claims on "commercial insurance polic[ies] with

honesty and diligence supported by evidence the insurer knew or should have known at the time

the insurer made a decision on a claim." C.J. § 3-1701(a)(4).   Judge Motz drew from Florida

case law interpreting a similar statute to articulate the following "totality of the circumstances"

standard, 636 F. Supp. 2d at 487:

> An evaluation of whether an insurer made an "informed judgment based on
> honesty and diligence supported by evidence the insurer knew or should have
> known at the time" of its coverage decision requires . . . an evaluation of the
> insurer's efforts to obtain information related to the loss, accurately and honestly
> assess this information, and support its conclusion regarding coverage with
> evidence obtained or reasonably available.

Judge Motz declined to apply a more stringent "fairly debatable" standard adopted by

some courts that recognize claims for bad faith denial of insurance coverage, notably including

the New Jersey Supreme Court in *Pickett v. Lloyd's*, 621 A.2d 445 (N.J. 1993), on which

Millennium relies.  Under the "fairly debatable" standard, "bad faith claims must be dismissed

before trial if summary judgment cannot be granted for plaintiff on the underlying claim,"

because the existence of a valid legal question as to coverage negates the insurer's bad faith.

*Cecilia Schwaber Trust Two*, 636 F. Supp. 2d at 485 (citing *Pickett*).  Judge Motz also cited a

leading Wisconsin case on the "fairly debatable" standard, stating that, "[w]hen a claim is fairly

debatable, . . . 'the insurer is entitled to debate it.'"  *Id.* at 485 (quoting *Anderson v. Cont'l Ins.

Co.*, 271 N.W.2d 368, 376 (Wis. 1978)).

Judge Motz rejected application of the "fairly debatable" standard under the Maryland

statute.[23]  However, the "fairly debatable" standard applies to New Jersey claims.  Moreover,

---

respect to which the applicable limit of liability exceeds $1,000,000," C.J. § 3-1701(c)(2)(iii),
which would apply here, assuming the statute applies at all.

[23] The Maryland appellate courts have not yet addressed the substantive standards that
govern claims under C.J. § 3-1701.  To my knowledge, the statute has been addressed in only a

New York permits a claim for consequential damages arising from an insurer's breach of a contract of business interruption insurance where the insurer violates the "implicit . . . covenant of good faith and fair dealing . . . 'to investigate in good faith and pay covered claims.'"  *Bi-Economy Market*, *supra*, 886 N.E.2d at 131 (citation omitted).  But, as I see it, Millennium cannot prevail on its bad faith denial claim regardless of which standard applies.  It is undisputed that the Insurers promptly provided Millennium with a reasoned basis for the denial of its claim, and then held the claim open to permit Millennium to marshal further evidence and argument in support of it.  The fact that plaintiffs ultimately were unable to persuade the Insurers to change their mind does not mean that the Insurers failed to act in good faith.

Although plaintiffs assert that the Insurers simply made up their mind to deny Millennium's claim, they have advanced no evidence from which a fact finder could conclude the Insurers had such a motive.  In his deposition, James Koutras, Millennium's Senior Corporate Counsel and Secretary, candidly admitted that "we don't have any evidence that [the Insurers] thoroughly investigated [the claim] or unthoroughly—whatever the opposite of thoroughly is—investigated it.  We don't have evidence either way."  Ex.15 to Insurers' Motion at 44 (ECF 151-17).

It is also noteworthy that the coverage dispute in this case presents a close question in an area of law (CBI insurance) that is not yet well developed in the courts.  If an insurer were required, as a matter of good faith, to concede to its insured whenever the precise contours of coverage were subject to reasonable debate, an insurer would never be entitled to test through

---

single reported case at the appellate level in Maryland, *see Thompson v. State Farm Mut. Auto. Ins. Co.*, 196 Md. App. 235, 9 A.3d 112 (2010), and that case concerned only procedural matters under the statute.

litigation the merits of a reasonably debatable policy interpretation. That would not constitute a requirement of good faith on the part of the insurer, but rather of rote acquiescence to any claim for coverage made by the insured that was not patently frivolous.

In order to prevail on a claim that the Insurers did not consider Millennium's claim in good faith, Millennium would need to produce some evidence from which a jury could find, in the words of C.J. § 3-1701(a)(4), that the Insurers did not make "an informed judgment based on honesty and diligence supported by evidence the insurer knew or should have known at the time." Millennium has failed to present such evidence, and so the Insurers are entitled to summary judgment as to Count III.

E.  Motions to Seal

The parties filed consent motions to submit numerous exhibits under seal in connection with the cross-motions for summary judgment (ECF 147, ECF 150, and ECF 158) (collectively, "Motions to Seal"). In particular, plaintiffs' motion (ECF 147) sought the sealing of three exhibits, while defendants' motions (ECF 150 and 158) sought to seal 35 exhibits, representing almost half of the exhibits that defendants submitted.

As grounds for sealing, defendants' motions asserted only that the documents were designated as confidential in discovery, pursuant to the Stipulation and Order Governing the Production and Exchange of Confidential Material entered by the Court June 16, 2010 (ECF 55-1, ECF 56, ECF 57). However, the bare fact that documents have been designated as confidential in discovery pursuant to a confidentiality order is not sufficient to justify the sealing of those documents when submitted to the court in conjunction with a dispositive motion. *See Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252 (4th Cir. 1988); *Butler v. DirectSAT*

*USA, LLC*, ___ F. Supp. 2d ___, 2012 WL 1203980, *11 n.18 (D. Md. Apr. 10, 2012);

*Waterkeeper Alliance, Inc. v. Alan & Kristin Hudson Farm*, 278 F.R.D. 136, 140-42 (D. Md.

2011); *Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 123 (D. Md. 2009); *Sensormatic Sec'y*

*Corp. v. Sensormatic Electronics Corp.*, 455 F. Supp. 2d 399, 437-38 (D. Md. 2006).

      Plaintiffs' motion similarly placed principal reliance on the confidentiality order, but also

asserted some additional arguments as to each of the three documents it sought to seal.

However, plaintiffs' arguments were largely unpersuasive, and provided no reason that less

drastic alternatives, such as the submission of redacted copies of the exhibits, would not suffice

to protect the parties' interests in confidentiality.[24]

      On August 22, 2012, I issued an Order (ECF 161) concerning the consent motions to seal,

in which I advised the parties that the Motions to Seal were, in my view, insufficient to comply

with the requirements of Local Rule 105.11.  I explained the following principles:

>       The common law "presumes the right of the public to inspect and copy all
> judicial records and documents." *Va. Dep't of State Police v. Washington Post*,
> 386 F.3d 567, 575 (4th Cir. 2004), *cert. denied*, 544 U.S. 949 (2005); *see also*
> *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 n.17 (1980)
> ("[H]istorically both civil and criminal trials have been presumptively open.").
> However, the common law right of access can be abrogated in "unusual
> circumstances," where "countervailing interests heavily outweigh the public
> interests in access." *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253
> (4th Cir. 1988); *accord Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 121
> (D. Md. 2009).
>
>       The common law right of access is buttressed by a "more rigorous" right
> of access provided by the First Amendment, which applies to a more narrow class

---

[24] Plaintiffs' argument as to one of the exhibits bears repeating.  Plaintiffs sought to seal
the rebuttal expert report of Mr. Chatfield, and observed that the Court previously had permitted
Mr. Chatfield's report to be docketed under seal in connection with defendants' motion to strike
portions of the report.  *See* ECF 136.  However, unlike the present summary judgment motions,
the motion to strike was not a dispositive motion to which the First Amendment public right of
access applies.  *See* Order of August 22, 2012 (ECF 161).

of documents, but is more demanding of public disclosure. *Rushford*, 846 F.2d at 253. The more narrow class of documents to which the First Amendment right of access applies includes documents "made part of a dispositive motion" in a civil case. *Va. Dep't of State Police*, 386 F.3d at 576 (citing *Rushford*, 846 F.2d at 253). If a court record is subject to the First Amendment right of public access, the record may be sealed "only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." *Stone v. University of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988) (citing *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984)); *see also Level 3 Commc'ns, LLC v. Limelight Networks, Inc.*, 611 F. Supp. 2d 572, 581-82 (E.D. Va. 2009) (recognizing that, although the Fourth Circuit has not expressly identified any basis to defeat the First Amendment public right of access other than a compelling governmental interest, other courts and the Fourth Circuit in an unreported decision have suggested that a property interest in trade secrets "might, depending on the circumstances of the case, suffice to override the strong First Amendment presumption of public access").

Notably, the district court "must determine the source of the right of access with respect to each document," because "only then can it accurately weigh the competing interests at stake." *Stone*, 855 F.2d at 181. Here, the documents have been submitted in connection with summary judgment motions. Accordingly, the more stringent First Amendment public right of access applies. *See Rushford*, 846 F.2d at 252 ("'[D]ocuments used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons.'") (quoting *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982)); *accord Lugosch v. Pyramid Co.*, 435 F.3d 110, 124 (2d Cir. 2006).

Local Rule 105.11 requires a party seeking to seal documents to provide the court with "reasons supported by specific factual representations to justify the sealing" and "an explanation why alternatives to sealing would not provide sufficient protection." In ruling on a motion to seal, the "district court must . . . weigh the appropriate competing interests under the following procedure: it must give the public notice of the request to seal and a reasonable opportunity to challenge the request; it must consider less drastic alternatives to sealing; and if it decides to seal it must state the reasons (and specific supporting findings) for its decision and the reasons for rejecting alternatives to sealing." *Va. Dep't of State Police*, 386 F.3d at 576 (internal citations omitted). The public notice and opportunity to challenge requirements are met when, as here, the court allows sufficient time for objections to be made. *See Padco Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 614 (D. Md. 2002) (stating that the "motions to seal have been docketed and available to the public [for eight months], thereby providing the requisite notice").

Accordingly, I directed the parties to file supplemental submissions adopting one of the following options with respect to each document or discrete category of documents at issue:

1. Provide the Court with "reasons supported by specific factual representations to justify the sealing" of the document(s) and "an explanation why alternatives to sealing [such as the submission of redacted copies] would not provide sufficient protection."  Local Rule 105.11;

2. Provide the Court with a redacted copy of the document(s), together with specific factual representations as to why the particular redactions are necessary;

3. Withdraw the assertion of confidentiality and request for sealing; or

4. Withdraw the document from consideration by the Court in connection with the summary judgment motions.

As to any document that was designated as confidential by a person or entity not a party to this case, I directed the parties to provide a copy of my Order to the third party.  I also informed the parties that I would hold the Motions to Seal *sub curia* pending receipt of their supplemental submissions.

In response to my Order, the parties filed supplemental submissions (ECF 162 & 163) in which they withdrew their requests for sealing as to the vast majority of exhibits previously submitted under seal.  There are only a handful of remaining exhibits as to which the Court must rule.

The Insurers only reiterate their request for sealing as to the transcript of the testimony of Mr. Riches of Alinta, which was taken in the Supreme Court of Western Australia for use in this case under letters rogatory, as well as three exhibits that were introduced into evidence through Mr. Riches' testimony at that hearing.  Some, but not all, of Mr. Riches' testimony was taken in closed court in Australia, apparently due to Alinta's desire to avoid publicly disclosing commercially sensitive proprietary information.  The transcript of Mr. Riches' testimony was submitted by the Insurers as Exhibit 8 to their motion (ECF 153-2).  Portions of the transcript

were also submitted by Millennium as Exhibit 4 to its motion (ECF 146-6), although Millennium has withdrawn its request to seal the document. The three exhibits that were introduced through Mr. Riches' testimony are the "Gas Supply and Purchase Agreement" between Alinta and Apache, Ex.9 to Insurers' Motion (ECF 153-3); another contract between Alinta and members of the NWS Joint Venture, Ex.10 to Insurers' Motion (ECF 153-4); and the notice of force majeure that Apache transmitted to Alinta on June 3, 2008, Ex.43 to Insurers' Motion (ECF 153-22).

In support of the request for sealing, the Insurers have submitted a letter dated August 30, 2012, from Alinta's Australian counsel, Ashurst Australia, to counsel for the Insurers, stating Alinta's position after review of the Court's Order of August 22, 2012. *See* ECF 162-2. Alinta's counsel states that, in its view, "the oral testimony and exhibits" from the hearing involving Mr. Riches "are commercially sensitive and confidential and should not be subject to potential inspection by the US public." *Id.* at 1. According to Alinta, the "evidence was obtained in closed-court session in Australia, reflecting an understanding by the parties and the Supreme Court of Western Australia that the subject-matter of the evidence was commercially sensitive and subject to confidentiality obligations binding on Alinta." *Id.* at 2. However, Alinta's counsel states that it is not prepared to address questions arising under United States law regarding whether the documents at issue should remain under seal, including "the question of whether the nature of the evidence would be sufficient to justify holding a closed-court hearing in the State of Maryland"[25] and "the requirements of the First Amendment." *Id.* Under the

[25] In my Order of August 22, 2012, I raised the question of whether the confidentiality concerns that led to the partial closure to the public of the hearing in Australia would also be sufficient to "justify closing the courtroom to the public in this Court if the same testimony were offered at trial." ECF 161 at 2. My question was prompted, in part, by the Fourth Circuit's statement in *Rushford*, 846 F.2d at 252, that, "[b]ecause summary judgment adjudicates

circumstances, Alinta's counsel represents that, as a non-party to this litigation, Alinta "is content" for the Court to "follow its usual rules and legal requirements about sealing documents led as evidence" in this Court, and that Alinta "does not wish to be heard further on the question of how the evidence obtained in Australia should be dealt with" by this Court. *Id.*

The Insurers, without further comment, have submitted the letter from Ashurst Australia under the rubric of "specific factual representations" to justify sealing under Local Rule 105.11. Millennium has also provided the Court with a copy of Ashurst Australia's letter, but Millennium asserts in its submission that it withdraws its request for sealing of the transcript of Mr. Riches' testimony because, in its view, "although portions of [the transcript] might qualify for sealing under the common law right to access standard, it does not meet the more rigorous standard that must be met when the First Amendment right of access applies." ECF 163 at 4-5.

If Mr. Riches' testimony and the accompanying documentary evidence had been taken in a domestic deposition, I would agree entirely with Millennium's analysis. However, in my view, the fact that the testimony and accompanying evidence were taken in the court of a foreign nation pursuant to letters rogatory counsels a more nuanced approach. Letters rogatory rely upon international comity, "the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987). In my view, where a foreign court has extended to the Court the courtesy of using its process to preserve evidence for proceedings in a tribunal of this country, there is a significant

---

substantive rights and serves as a substitute for a trial," evidence submitted at the summary judgment stage should not be sealed where, "if the case had gone to trial and the documents were thereby submitted to the court as evidence, such documents would have been revealed to the public and not protected . . . ."

governmental interest, grounded in international comity and foreign relations, in not upsetting the expectations under which evidence was presented in that foreign court, which may not necessarily be subject to the same rights of public access that obtain in the courts of this country. I weigh this interest in comity against an apparently minimal interest in full public disclosure of the documents at issue.[26]  Accordingly, as to Mr. Riches' testimony, the portions that were taken in closed court in the Supreme Court of Western Australia will remain under seal.[27]

In addition, the contractual agreements between Alinta and the gas producers will remain under seal; to the extent that the contracts contain matter that is relevant to the Court's ruling as to the summary judgment motions, that matter is revealed in this Memorandum Opinion.  The vast majority of the information in the contracts is irrelevant to the matters at issue, and need not be disclosed.  Finally, however, I see no basis for sealing of the notice of force majeure, as the Court cannot discern any information in it that is not likely already well known to the Australian public, in light of the serious impact of the Varanus Island explosion upon the Western Australian economy.

The only remaining document as to which there is an outstanding request for sealing is Exhibit 27 to Millennium's Motion, which is plaintiffs' claims submission to the Insurers dated December 31, 2008.  Millennium has submitted an unsealed, redacted version of this document, and has withdrawn the redacted pages from consideration by the Court in connection with the motions for summary judgment.  Millennium advises that it does "not believe that the removed

---

[26] The issues addressed in the testimony and exhibits are not matters of obvious public concern and no opposition has been filed to the motions for sealing.

[27] In the Order that accompanies this Memorandum Opinion, counsel are requested to submit an unsealed copy of only the portion of Mr. Riches' testimony that was given in open court.

pages are necessary to support" its motion.  ECF 163 at 5.  The Court agrees.  Therefore, Exhibit 27, as originally submitted (ECF 146-29), will be withdrawn in favor of the redacted, unsealed submission (ECF 163-4).

In sum, except as noted above, the Motions to Seal will be denied.

### Conclusion

For the foregoing reasons, Millennium's motion for partial summary judgment will be granted, and the Insurers' cross-motion for summary judgment will be granted in part and denied in part.  Moreover, the parties' motions to seal will be denied, except as specifically noted.  An Order implementing these rulings follows.


Date:   September 28, 2012                        _____/s/_____
                                                  Ellen Lipton Hollander
                                                  United States District Judge